HOISTING AND PORTABLE ENGI-
NEERS LOCAL NO. 701, Plaintiff,

v.

PIONEER CONSTRUCTION COMPANY,
an Oregon corporation, and Carl Hal-
vorson, Daryl K. Mason and Howard V.
Morgan, co-partners doing business as
Rivergate Rock Products, Defendants.

Civ. No. 68–704.

United States District Court,
D. Oregon.

Feb. 17, 1970.

Don S. Willner, Willner, Bennett & Leonard, Portland, Or., for plaintiff.

Norman B. Kobin, Kobin & Meyer, Portland, Or., for defendant Pioneer Const. Co.

W. F. Lubersky, Michael G. Holmes, McColloch, Dezendorf, Spears & Lubersky, Portland, Or., for defendants Carl Halvorson, Daryl K. Mason and Howard V. Morgan, co-partners doing business as Rivergate Rock Products.

## OPINION

ALFRED T. GOODWIN, District Judge:

Local 701, Hoisting and Portable Engineers, sues defendants under 29 U.S.C. § 185(a) for breach of a collective-bargaining agreement. The sole issue is whether defendant Rivergate Rock Products is a successor to defendant Pioneer Construction Co. for the purposes of the bargaining agreement.

The facts are agreed. Pioneer is an inactive corporation which formerly operated both a commercial rock-crushing plant and a contracting business. Pioneer performed asphalt-paving contracts, hauling, grading, and related services in connection with heavy construction work. Rivergate is a partnership which presently operates the rock-crushing plant formerly operated by Pioneer.

Pioneer was a member of the Associated General Contractors of America, a trade association which represented Pioneer in collective bargaining with Local 701 and other unions engaged in the heavy-construction industry. Just before Pioneer ceased doing business, it was employing approximately 45 persons, some of whom worked interchangeably in the production of sand and gravel and in the performance of Pioneer's construction contracts. Five of these employees, a quarry superintendent, an asphalt-paving manager, a paving foreman, an asphalt-plant foreman, and a construction supervisor were considered to be supervisory employees.

Of the substantial shareholders of Pioneer, one, Jack Eatch, was the construction supervisor. Another, Howard Morgan, was general manager in charge of sales, finance, and administration. Morgan is a partner in Rivergate; Eatch is not associated with Rivergate.

On or about May 1, 1968, Pioneer was experiencing financial difficulty and was delinquent in forwarding state and federal withholding taxes. A group of shareholders, which included Morgan, made up 51 per cent of Pioneer's ownership. The Morgan group purchased the remaining shares and began to liquidate Pioneer's operations.

On June 30, 1968, Morgan, Halvorson, and Mason, as partners, formed Rivergate Rock Products. Halvorson and Mason had been strangers to Pioneer.

On July 1, 1968, Rivergate leased Pioneer's physical assets, less certain construction equipment which was sold. Pioneer then assigned to Rivergate all its supply contracts. Pioneer contemporaneously assigned all its construction contracts to various construction companies. On July 25, 1968, Rivergate subleased the asphalt plant, which it had taken over from Pioneer, to Cascade Construction Company. By October 15, 1968, Rivergate was operating only the gravel plant, and all unrelated equipment which had not been sold to pay Pioneer's debts had been subleased to Cascade. There is no claim that Cascade is related to Rivergate in ownership or management.

On October 15, 1968, Pioneer advised Local 701 that it had ceased all contracting operations, and gave notice that it was terminating its contract with Local 701 as of October 19, 1968. On October 19, Pioneer discharged all its employees.

Rivergate then hired Pioneer's quarry superintendent and 18 other former Pioneer employees. Rivergate hired none of Pioneer's four other supervisors. Morgan, who had been general manager for sales, administration, and finance for Pioneer, continued to perform those same functions for Rivergate.

Rivergate employed as its general manager for production a man who had not

been associated with Pioneer. Rivergate also employed nine other persons Pioneer had not employed. All employees, including the former Pioneer employees, went on the Rivergate payroll at a rate of pay lower than that called for in the agreement between Local 701 and Pioneer, but at the rate of pay provided for in an agreement between Local 701 and the trade association which represented the area's commercial gravel producers.

Rivergate advised all interested unions that Rivergate had been accepted (on August 1, 1968) as a member of the Sand, Gravel & Concrete Association, and requested that the unions add Rivergate as a party to their respective commercial sand-and-gravel labor agreements. Two unions agreed to recognize Rivergate as a member of the Sand, Gravel & Concrete Association under their current agreements with that association. Local 701 refused to do so, contending that Rivergate, as the successor of Pioneer, was bound by the collective-bargaining agreement with the Association of General Contractors.

Rivergate refused to pay the wages called for in the A.G.C. agreement, but the parties have agreed that the employees of Rivergate who were members of Local 701 would continue to work, reserving any right to additional pay pending the outcome of this litigation.

The leading case in which "successorship" has been an issue is John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). A small company, Interscience, merged with a much larger company, John Wiley & Sons, and ceased doing business as a separate entity. Wiley absorbed all the employees of Interscience. A union which had represented 40 of the 80 Interscience employees contended that it still represented those employees, and argued that Wiley was bound by the collective-bargaining agreement with Interscience. One week before that agreement expired, the union sued to compel arbitration.

The Court, recognizing "the central role of arbitration in effectuating national labor policy," 376 U.S. at 549, 84 S.Ct. at 914, held as follows:

"* * * [T]he disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and * * *, in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement." 376 U.S. at 548, 84 S.Ct. at 914.

The Court then said that the duty to arbitrate would not always survive:

"* * * [T]here may be cases in which the lack of any substantial continuity of identity in the business enterprise before and after a change would make a duty to arbitrate something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved. * * *" 376 U.S. at 551, 84 S.Ct. at 915.

The Court held that in the Wiley-Interscience merger the "relevant similarity and continuity of operation across the change in ownership * * * [was] adequately evidenced by the wholesale transfer of Interscience employees to the Wiley plant, apparently without difficulty. * * *" 376 U.S. at 551, 84 S.Ct. at 915.

Wackenhut Corp. v. International Union, United Plant Guard Workers, 332 F.2d 954 (9th Cir. 1964), was factually similar to *Wiley* except that the smaller company, General Plant Protection Co., was acquired by purchase rather than by merger and was operated without interruption as a division of Wackenhut. The court held that the means of acquisition was irrelevant in light of the national labor policy to protect "employees covered by a collective bargaining agreement containing an arbitration clause, from a sudden change in the employment relationship." 332 F.2d at 958. The court then found that Wackenhut's wholesale acceptance of General Plant employees showed sufficient relevant

similarity and continuity of operation to bind Wackenhut to the collective-bargaining agreement entered into by General Plant. *Cf.*, S. S. Kresge Co. v. N. L. R. B., 416 F.2d 1225 (6th Cir. 1969); Retail Clerks Union Local No. 1552 v. Lynn Drug Company, etc., 299 F.Supp. 1036 (S.D.Ohio, 1969); In re Lloyd A. Fry Roofing Co., 71 L.R.R.M. 1492 (1969).

N. L. R. B. v. Alamo White Truck Service, Inc., 273 F.2d 238 (5th Cir. 1959), was the converse of *Wiley* and *Wackenhut*, in that it involved the incorporation of a new business to purchase certain assets of a branch of a much larger business. The union which had represented the branch employees contended that the new business was the successor to the branch and was bound to recognize the union as the bargaining representative of employees of the new business.

The court held that the new business was a bona fide independent business with a substantially narrower scope of operations than the former enterprise had conducted. The court regarded the "employee-employer relationship as a most important element in determining whether there is sufficient continuity between two employing enterprises to justify enforcing an NLRB order against a company that was not a party to the original proceeding that generated the certification. \* \* \*" 273 F.2d at 242. Because none of the employees of the new business had belonged to the union at the branch business, and in light of the much more personal nature of the employee-employer relationship at the new business, the court concluded that it would be unjust to force the company to bargain with the union unless the employees chose to join that union.

A number of decisions have refused to compel an employer to bargain with a union which had represented the employees of a predecessor. See, e. g., N. L. R. B. v. John Stepp's Friendly Ford, Inc., 338 F.2d 833 (9th Cir. 1964); Thomas Cadillac, Inc., 67 L.R.R.M. 1504 (1968);

Federal Electric Corp., 66 L.R.R.M. 1089 (1967); Ellary Lace Corp., 72 L.R.R.M. 1063 (1969). Some of these decisions say that the court finds a "lack of any substantial continuity of identity in the business enterprise before and after" the change in the business entity. The language quoted from the *Wiley* case, 376 U.S. at 551, 84 S.Ct. at 915, however, does not describe a test or standard; it merely summarizes the conclusion the court or board has reached.

■ The tests of "substantial continuity" that can be drawn from the facts of the decided cases include: the continuity of supervisory personnel; the similarity of the employee-employer relationships; the similarity in the range of skills of the work force before and after the change; the similarity in the end-product manufactured or in the service rendered before and after the change; the similarity in the size of the work force; the similarity of plant and equipment; continuity of ownership or management; whether or not the change in the business entity was based upon economic or business considerations that were independent of any advantage or disadvantage that might accrue to labor or management in a bargaining context; and similar considerations.

■ In cases in which the only issue is the union's right to represent the new work force, it is apparent that the tests of continuity are rather strictly construed, and doubtful cases are resolved against judicial intervention in the bargaining process. One reason for this result, no doubt, is the relative ease with which the matter can be resolved through a representation election.

In cases in which the issue is the right of a recognized union to arbitrate a grievance or dispute, however, the policy enunciated in the *Wiley* case in favor of arbitration tends to cause the court to resolve doubtful questions of continuity in favor of the union, with the result that arbitration is ordered under the contract. See, e. g., Retail Clerks Union Local No. 1552 v. Lynn Drug Company, etc., *supra*.

A possible third grouping of cases includes those which, like this case, fall somewhere between union recognition and arbitration. Here we have a situation in which a recognized union and an employer are engaged in a dispute over which of two contracts ought to govern the rights of the workmen. The union is seeking to enforce against a nonsigning employer a contract more favorable to the union than the contract which the employer prefers. In a case of this kind, the resolution of the conflict ought to be functionally related to the reasonable business expectations of the parties.

In the absence of some reason for piercing the entity veil, legitimate changes in business entities are entitled to be taken at face value. Here there was a valid economic reason for discontinuing Pioneer's business operations. The corporation with which the union had made the original contract is no longer able to perform that contract. The new business entity made no such contract. While Rivergate has in an owner-management role one person who had played an owner-management part in the old business entity, Rivergate is truly a new entity and not merely the old ownership in a new form.

The end-product of the business operation under the new management is commercial sand and gravel. The end-product of the old business included commercial sand and gravel, but also included paved streets and highways. These latter end-products required far more complex operations than does the business of selling sand and gravel. The range of skills of the work force is greatly restricted in the new organization as compared to that required by the old. The work force is smaller, and the supervision is much narrower. The reasons for the higher rate of pay enjoyed by construction workers, such as travel to distant job sites, the seasonal nature of the work, the wage rates paid other crafts on the same job, and the like, do not exist in the same or even in similar degree in the commercial gravel operation of the new firm.

In entering into one type of contract with commercial suppliers and another type of contract with construction companies, the union itself recognizes cogent economic reasons for treating the two kinds of business as dissimilar.

From a consideration of all these indicia of continuity, I conclude that Rivergate is not a continuation of Pioneer's business and ought not to be bound by the contract entered into between Local 701 and Pioneer.

This opinion shall serve as findings of fact and conclusions of law under Fed.R. Civ.P. 52(a). The defendants will prepare a judgment in accordance with the findings and conclusions above.