**JOINT BOARD OF CLOAK, SKIRT AND DRESSMAKERS UNION OF the INTERNATIONAL LADIES GARMENT WORKERS UNION, AFL-CIO, Plaintiff,**

v.

**SENCO, INC., and Maco Clothing Corporation, Defendants.**

Civ. A. No. 68-45.

United States District Court, D. Massachusetts.

March 27, 1970.

Robert M. Segal, Segal & Flamm, Boston, Mass., Leonard Greenwald, New York City, for plaintiff.

Melvin Pierce, and Cornelius J. Moynihan, Jr., Peabody, Brown, Rowley & Storey, Boston, Mass., for Senco, Inc.

Sidney Coven, Lepie & Coven, Boston, Mass., for Maco Clothing Corp.

## OPINION

GARRITY, District Judge.

On January 19, 1968 the Joint Board of Cloak, Skirt and Dressmakers Union of the International Ladies' Garment Workers Union, AFL–CIO (the Union) brought an action in this court under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, to enforce an arbitration award that had been issued against Senco, Inc. (Senco) and Maco Clothing Corporation (Maco), both Massachusetts corporations engaged in the manufacture of ladies' garments. On August 28, 1968 the court ruled on cross motions for summary judgment, Joint Board of Cloak, Skirt & Dressmakers Union v. Senco, Inc., D.Mass., 1968, 289 F.Supp. 513.

It has not been disputed that on January 4, 1965 a collective bargaining agreement was entered into between the plaintiff Union and the Association of Garment Contractors, Inc., a multiemployer bargaining unit. Senco was at that time a member of the Association and a signatory of the collective bargaining agreement. Under Articles 35 and 36 of that labor contract, any unresolved dispute was to be submitted to arbitration for final decision by an arbitrator called an impartial chairman. Article 69 provided that subsidiary, auxiliary or affiliated firms or corporations would be bound by the terms of the agreement. Throughout the litigation plaintiff Union has alleged, and Maco denied, that Maco is such a firm or corporation.

On January 24, 1967 plaintiff submitted to the arbitrator an unresolved complaint that Senco and Maco had violated the agreement in a number of respects and requested damages and other relief. The arbitration hearings proceeded despite the fact that neither Senco nor Maco responded to notices of the hearings tendered to them nor were represented in any way before the arbitrator. On October 27, 1967 the arbitrator issued his opinion and award *ex parte*. Among other things, he found pursuant to Article 69 of the collective bargaining agreement that Maco was a subsidiary of Senco and was therefore bound by the fact that Senco was a signatory to the contract.

In its earlier decision, already mentioned, this court ruled on motions for summary judgment filed by all the parties, that is, by the Union, Senco and Maco. The cross motions pertaining to the claim of the Union against Maco were denied without prejudice. The question of Maco's liabilities under the arbitrator's award required a prior judicial determination that Maco, which had not signed the labor agreement itself, could be bound by the arbitration clause by virtue of its relationship with Senco, which was a signatory. We noted, Joint Board of Cloak, Skirt & Dressmakers Union v. Senco, Inc., *supra* at 526, that the guiding principle on this point was set out clearly in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543 at 547, 84 S.Ct. 909 at 913, 11 L.Ed.2d 898:

> Here, the question is whether Wiley, which did not itself sign the collective bargaining agreement on which the Union's claim to arbitration depends, is bound at all by the agreement's arbitration provision. The reason requiring the court to determine the issue is the same in both situations. The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty. Thus, just as an employer has no obligation to arbitrate issues which it has not agreed to arbitrate, so *a fortiori*, it cannot be compelled to arbitrate if an arbitration clause does not bind it at all.

Absent a judicial determination that Maco is bound to the arbitration clause

of the contract signed by Senco by virtue of its relationship to Senco, the arbitrator's findings and award, including his finding that Maco is a subsidiary of Senco, could be binding only on Senco and not on Maco. Since neither the Union nor Maco provided the court with enough facts to rule with finality on this issue of relatedness, the cross motions for summary judgment were denied.

Subsequently, on October 30, 1969, the parties agreed by stipulation that the court receive as evidence the official transcript of the sworn testimony and exhibits received in evidence at a hearing before a trial examiner for the National Labor Relations Board. This hearing related to charges of unfair labor practices brought by the Union against Senco, Maco and others. One of the major issues involved there and treated throughout more than 2400 pages of transcript and 150 exhibits was the integration of Maco with Senco.[1]

It is on the basis of this record that the court will decide whether Maco, though as a corporate entity itself not a signatory to the contract containing the arbitration clause, should nonetheless be bound by the arbitrator's award. As part of their stipulation, both parties reserved the right to object to the relevancy or admissibility of any portions of the transcript or exhibits. Maco has objected to, and has requested the court to disregard, testimony by certain individuals that Henry Senese had made statements to them that he owned and/or controlled Maco. This testimony is important because plaintiff relies chiefly on the alleged common control of both Senco and Maco by Senese in urging that an inference of integration should be drawn. Maco objects to the admissibility of their testimony because, at this juncture in the proceedings it is being offered against Maco alone and so Senese's statements made outside the presence of and not acquiesced in by any authorized representative of Maco should be excluded as hearsay and not binding on Maco.

■ Senese, however, was himself a witness. He was examined under Rule 43(b), Fed.R.Civ.P., by the attorney for the general counsel of the Board. He was therefore available for examination regarding his alleged prior statements. The record shows that he continually denied any control over Maco. The testimony that Senese had previously made statements to the contrary were certainly admissible to impeach Senese's own testimony. The use of such evidence need not be limited to impeachment purposes. Asaro v. Parisi, 1 Cir., 1962, 297 F.2d 859, 863–864. See also Rule 63(1) of the proposed Uniform Rules of Evidence. Accordingly, the court overrules the objections to the admissibility in evidence without limitation of testimony relating to statements by Senese that he was in control of Maco.

### Findings of Fact

1. For approximately three years prior to the formation of Senco, Inc., in 1960 Henry Senese had been proprietor of Paula Sportswear, a company, like Senco, involved in the production of women's wearing apparel. Despite Henry Senese's testimony to the contrary, he was the "boss" and the individual in charge of the operations of Paula Sportswear.

2. In September 1960 Senco was incorporated. It took over the premises at 10 Frankfort Street in East Boston formerly occupied by Paula Sportswear Company. In the summer of 1963 it also opened a shop at 104 Meridian Street. Senco's operations were similar to Paula Sportswear's. Stitching and sewing were done at the Meridian Street plant, while cutting, pressing and finishing were performed at Frankfort Street.

3. The incorporators of Senco were Mary B. DeSimone, also known as Mary Senese, Phyllis Baldassari and Kenneth C. Senese, the wife, mother and brother respectively of Henry Senese. Mary

---

1. The cases before the Board were decided on June 30, 1969 in 177 NLRB No. 102.

542

Senese was said to be the owner and to have received all the stock of the company but she could not produce any stock certificates at the hearing.

4. In early 1966 Henry Senese formed the HMS corporation. He was named as president, his wife Mary the treasurer and, along with an attorney, Barry Levin, each was a director. Henry Senese was admittedly in sole control of this business. HMS had its offices on the lower floor of the same building as Senco at 104 Meridian Street. HMS, however, unlike Senco, did not produce any garments. It was a jobber for the garment manufacturer and the companies that did the actual stitching, cutting and finishing.

5. Also in early 1966 Henry Senese bought a one-half interest with Solomon Nash in Bonnie Jaye, a company in Middleboro, Massachusetts which like Senco was in the business of producing ladies' garments. Senese through HMS and through personal contacts provided Bonnie Jaye with its work.

6. According to Henry Senese he simply worked for his wife as general manager of Senco, severing his relationship with that company at the end of 1966. Despite the fact that he was not the record owner, it is clear that at all relevant times he was in as much control of Senco activities as he was in control of the operations of HMS. Senco was run according to the overall business purposes of Henry Senese. The following facts illustrate his dominion over the affairs of Senco:

(a) Through HMS he provided Senco with work from John Meyer of Norwich, Connecticut, a garment manufacturer. This amounted to approximately 80 or 90% of Senco's work. HMS leased stitching and finishing machines to Senco. For this HMS was to receive a monthly rent of $500, but no such rental payments were ever made. HMS neither required nor ever received invoices from Senco. With other companies such invoices were used. Senco used HMS trucks. HMS checks were used to pay for items or services benefitting Senco alone; e. g., an advertisement for help in the East Boston Times, payments on Senco sewing machines and liquor sold and billed to Senco.

(b) The Meridian Street premises of both HMS and Senco were owned by Henry Senese and his wife. Neither company paid any rent and Henry Senese personally made payments on the bank mortgage.

(c) Although Mary B. DeSimone (Mrs. Senese) alone was authorized to sign Senco checks, Henry Senese often signed her name either on behalf of Senco or for his own purposes. He signed Senco checks with his wife's name in amounts of $1000 and $1800 to meet the Bonnie Jaye payroll. Although Mrs. Senese was purportedly the owner and controlling head of Senco and although her testimony showed her to be an extremely astute woman, she exhibited an extreme lack of knowledge concerning the business details of Senco and was in fact rarely on Senco premises. She visited the premises infrequently, usually accompanied by her children. Despite his lack of corporate office or record ownership, Henry Senese controlled Senco's activities for his own business purposes and profit.

7. Maco Clothing Corporation was incorporated on September 2, 1966 with its place of business at 421 Broadway, Revere, Massachusetts. It performed precisely the same function in the ladies' garment industry as Senco. Julia Bocchino was listed as president, Phyllis Bocchino as treasurer and Irene Rotondi as clerk. All were named as directors. Both Phyllis Bocchino and Irene Rotondi had been key employees of Senco. Phyllis Bocchino claimed to be the owner and operator of Maco. However, Henry Senese was responsible for financing and organizing Maco and he controlled it in much the same manner that he had controlled Senco, and for his own business purposes. The Bocchino sisters and Irene Rotondi were merely figureheads. Maco was formed and flourished while Senco faded away so that Senese could

eliminate the ILGWU from its operations and continue business with John Meyer of Norwich, Connecticut. Senese's dominance over Maco is shown by the following facts:

(a) Six out of the first seven employees of Maco had just previously worked for Senco.

(b) Phyllis Bocchino claimed to have made an $11,000 investment into the Maco corporation, yet there was no substantiation of this claim either in the Maco records or elsewhere. The only capitalization shown on the Maco general ledgers was an "initial investment" of $589.52 listed on November 8, 1966 and a $200 carpentry payment on November 9, 1966. On November 9, Henry Senese gave an HMS check to Phyllis Bocchino for $789.52, the sum of the two Maco entries.

(c) Two Senco checks, one for $500 and another for $1000 were issued to Crescent Realty, Maco's landlords. There was no indication in the evidence that these were Senco expenses.

(d) Solomon Nash, Senese's partner in the Bonnie Jaye contracting shop in Middleboro, Massachusetts, accompanied Senese to the John Meyer Company in Connecticut, where Senese stated that he was opening up a shop in Revere with Teamsters. A week or two later Nash accompanied Senese to the Revere location of Maco—at this time still a garage—where Senese told him of the corporate arrangements his brother Rocco was making in setting up the Maco company, that the girls at the Senco plant on Frankfort Street would either work in Revere or look elsewhere and that the Senco shop on Meridian Street would be gradually phased out.

(e) In August of 1966 Senese told Michael Viarella, the foreman at the Senco Frankfort Street plant, that he was going to move the Senco operation to Revere and operate under the Teamsters so that he could continue to receive work from John Meyer of Connecticut. A week later Viarella accompanied Senese to the Revere plant location where they discussed placement of the machinery. Later Viarella went to Revere with a steamfitter to show him where to place the fittings for the pressing machines. In late October of 1966, Viarella, on orders from Senese, moved seven stitching machines from Senco's Frankfort premises to Maco's premises in Revere. A week later a pressing machine was also moved.

(f) On November 4, 1966, a Saturday, there was a fire at the Senco Frankfort Street shop. On that night Senese told Viarella to salvage what he could and to contact the girls who would have reported to Senco on Monday and tell them to report to Maco in Revere. After that Viarella began to work at Maco where he supervised the pressers.

(g) In late 1966 Henry Senese spoke to the girls at the Meridian Street plant of Senco telling them that beginning in 1967 they would be working at Maco as Teamsters. He also mentioned that Senco had withdrawn from the Contractors Association that had the collective bargaining agreement with the ILGWU. In December of 1966 Henry Senese took Murray Adelman, a garment cutter, to the Maco plant in Revere in order to pick up a sample that was needed before Adelman could perform the cutting work that Senese wanted him to do. He told Adelman that it was his plant, showed him where he was going to put the cutting tables and mentioned the possibility of Adelman's working for him.

(h) In January of 1967 Solomon Nash sold out his interest in Bonnie Jaye. Although 90% of its work had been supplied by John Meyer through HMS, it was no longer getting any work. Prior to Nash's selling out, some of Bonnie Jaye's work was simply cutting. When this was the case, at first it was sent to Senco and later to Maco for finishing. Nash had negotiated with Henry Senese. He had no dealings with Phyllis Bocchino; yet the sale as consummated was with Maco. Nash received $1000 for his interest. Senese also sold his half to Maco—but supposedly received

only $100. The disparity was never explained.

(i) HMS leased stitching and finishing machines to Maco at a purported $700 a month rent. As with Senco, no rent was ever paid. As had Senco, Maco used HMS trucks. As with Senco, HMS provided John Meyer work for Maco. This comprised about 90% of Maco's production. About the same percentage had been applicable to Senco. Just as he had signed his wife's name to Senco checks, Senese signed Phyllis Bocchino's name to Maco checks. As with Senco, HMS neither required of nor received invoices from Maco. But as Maco flourished, Senco began to die. By February, 1967 there was no more work at Senco.

 It is clear that both Senco and later Maco were corporate instruments used by Senese for his own business purposes. Senese's dominance of both companies and the substantial identity of their functions prove not simply a substantial continuity of enterprise between the companies but rather an essential oneness. This relationship is certainly more than adequate under John Wiley & Sons, Inc. v. Livingston, *supra*, to justify the imposition upon Maco of the arbitration provision signed by Senco. It also justifies the arbitrator's application of the substantive contract provisions upon Maco as if it had been a signatory to the contract. See generally, Note, The Successor Employer's Duty to Arbitrate: A Reconsideration of John Wiley & Sons, Inc. v. Livingston, 1968, 82 Harv.L.Rev. 418.

Pursuant to the court's decision in Joint Board of Cloak, Skirt & Dressmakers Union v. Senco, Inc., *supra*, judgment was entered against Senco on September 29, 1969. To the extent that the arbitrator's award was enforced against Senco by that judgment, it should now be likewise enforced against Maco. Accordingly it is ordered that judgment be entered against Maco such that it will be jointly and severally liable with Senco on the judgment entered on September 29, 1969.