The **BOEING COMPANY, Plaintiff-Appellee-Cross Appellant,**

v.

**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, et al., Defendants-Appellants-Cross Appellees.**

No. 73–1052.

United States Court of Appeals, Fifth Circuit.

Nov. 15, 1974.

308

Plato E. Papps, Bernard Dunau, Washington, D. C., Frank E. Hamilton, Jr., Tampa, Fla., for defendants-appellants.

James M. Blue, Miami, Fla., Granville M. Alley, Jr., Tampa, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, and GEWIN and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

This clash between the Boeing Company (Boeing) and the International Association of Machinists and Aerospace Workers (IAMAW) over Boeing's obligations to some 1100 installation support services employees at John F. Kennedy Space Center, Florida, has spread far beyond the launch pad and into the exec-

utive bureaucracy, the halls of Congress, and several federal courtrooms. In other forums, the great issues of national labor policy and government contracting policy have been debated and determined in their ways. Ours is the more mundane, but nonetheless complex, task of defining the obligations of a successor employer to arbitrate claims submitted by a union on behalf of incumbent employees of a predecessor employer.

### I

### FACTS

From March, 1964, until April 1, 1971, Trans World Airlines, Inc. (TWA) performed "installation support services"[1] at Kennedy Space Center under contract with the National Aeronautics and Space Administration (NASA). The approximately 1100 nonsupervisory personnel employed by TWA were represented in collective bargaining by IAMAW. A collective bargaining agreement between TWA and IAMAW,[2] entered into on January 28, 1970, was in force at the time TWA's contract with NASA expired, and was to "remain in full force and effect to and including December 31, 1971." Two subordinate IAMAW units, District Lodge 142 and Local Lodge 773, helped administer the TWA-IAMAW agreement.

In June, 1970, NASA invited bids for performance of the Kennedy Space Cen-

ter installation support services duties for a one-year period commencing February 1, 1971 (performance to begin April 1, 1971), with option for NASA to extend the contract for four successive one-year periods. TWA, Boeing, and five other companies submitted proposals. Four of the offerors, including TWA, based their computations of labor costs on the wage rates and fringe benefits established by the existing TWA-IAMAW collective bargaining contract. Boeing based its computation of labor costs on the wage rates and fringe benefits provided under its own existing collective bargaining agreement with IAMAW, which covered some 287 Kennedy Space Center employees performing mission support services known as "hardware contracts" on the Saturn V launch vehicle. The wages and benefits fixed by the Boeing-IAMAW agreement were substantially below those specified in the TWA-IAMAW agreement,[3] and the Boeing-IAMAW agreement was administered through different local subordinates, District Lodge 166 and Local Lodge 2061.

In November, 1970, NASA announced that Boeing had been selected to perform the installation support services at Kennedy Space Center. Although both TWA and IAMAW vigorously protested NASA's decision,[4] Boeing began per-

---

1. These services included maintenance, refurbishing, and alteration of buildings, and new construction involving outlays of less than $10,000; maintenance of roads and grounds; operation and maintenance of water and sewage plant, heating and air-conditioning systems, heavy equipment, and automotive equipment; ordering and distribution of supplies; and similar housekeeping functions. TWA subcontracted guard, fire, and janitorial services to other firms.

2. When TWA, an air carrier, secured the NASA support services contract in 1964, TWA and IAMAW already had a nationwide collective bargaining agreement, which was governed by the Railway Labor Act, 45 U.S.C. § 151 et seq. By supplemental agreement entered into between TWA and IAMAW, the non-carrier Kennedy Space Center employees of TWA were brought under the previous agreement.

3. Hourly rates of Boeing's wage scale were lower than TWA's in 20 of the 22 job classifications, with the differentials ranging from 4% to 26% (of the lower rates).

4. IAMAW notified NASA in November and December of 1971 of its claim that installation support services labor rates at Kennedy Space Center were governed by the TWA-IAMAW agreement. TWA likewise protested that government purchasing power was being used "as an instrument to deprive organized employees of an incumbent contractor of the wages and other benefits gained through collective bargaining, a result contrary to national labor policy and government procurement policy." Nevertheless, in a January 6, 1971 letter to the Comptroller General of the United States, NASA indicated that it had found TWA's proposal to be technically superior to Boeing's, but had selected Boeing primarily because of Boeing's substantially lower proposed labor costs.

formance of the contract on April 1, 1971, with a work force of 981,[5] of whom 380 were TWA incumbents. On this appeal the parties have debated at length the reasons why a greater percentage of incumbents were not hired by Boeing. The district court's opinion provides a partial summary:

When Boeing first learned that it would get the contract for support services commencing April 1, 1971, it delivered over 1,000 job application forms to TWA's Industrial Relations office for dissemination to TWA employees. Boeing offered evidence that IAM[AW] officials—International and local—had discouraged TWA support service employees from seeking employment with Boeing and for that reason by April, 1971, of the approximately 1,000 Boeing employees hired to perform under the support services contract less than 400 were formerly TWA employees. At first in the course of this suit the defendants contested that position . . . and contended there was discrimination by Boeing in its hiring. However, in its brief filed July 3, 1972, IAM[AW] withdrew for the purposes of this case that contention.

Boeing Co. v. International Association of Machinists & Aerospace Workers, M. D.Fla.1972, 351 F.Supp. 813, 815. IAMAW emphasizes here, however, that the TWA employees were dissatisfied with the wages and benefits offered under the Boeing contract and that the environment surrounding Boeing's takeover was highly unsettled. In particular the union argues that Boeing and NASA had not yet entered into a contract, and a TWA protest to the contract award was still pending, as of early February, 1971, so that it would have been prema-

ture for the incumbent work force to commit itself to a contractor whose selection was still in doubt. In any case, by February 19, 1971, when an IAMAW spokesman told Boeing representatives that the union would cooperate in distributing Boeing employment applications to TWA incumbents and in transmitting completed applications to Boeing, Boeing had extended offers to and received acceptances from 521 nonincumbents, more than half its workforce.

When Boeing took over performance of the installation support services work on April 1, 1971, the TWA incumbents hired by Boeing reported for work as new employees with no seniority and at reduced wages. Boeing gave each of the IAMAW-represented employees a copy of the Boeing-IAMAW agreement and a notice stating that IAMAW was its employees' representative and that terms of employment were governed by the Boeing-IAMAW agreement.

On April 26, 1971, IAMAW advised Boeing that

[i]n accordance with Article XI(b)(5) of the [TWA-IAMAW] collective bargaining agreement . . . [it was] submitting the following grievance relating to matters general in character:

1. The Boeing action failed to retain in employment as of April 1, 1971, at least 602 members of the incumbent work force performing installation support services work at Kennedy Space Center, Florida, and this failure constitutes a reduction in force out of seniority order, and/or a dismissal without just cause and without compliance with the procedures requisite to that action, in violation of the IAMAW/TWA agreement.

On March 1, 1971, TWA brought an action against NASA in United States District Court for the District of Columbia to set aside NASA's selection of Boeing, and moved for a preliminary injunction to restrain NASA from entering into a contract with Boeing. After denying a motion to intervene by IAMAW, the district court on March 10, 1971, denied TWA's motion for a preliminary injunction. On April 26, 1971, the parties entered into a stipulation dismissing the action without prejudice.

5. This figure represents the total number of employees performing installation support services work and within the unit claimed to be covered by the TWA-IAMAW agreement.

2. The Boeing Company failed and fails to accord to the members of the incumbent work force whom it did retain in employment on April 1, 1971, the seniority that each employee had as of April 1, 1971, but instead treats them as new hires with zero seniority.

3. The Boeing Company failed as of April 1, 1971 and fails, to observe the wages, other benefits, and other employment terms of the TWA/IAMAW agreement as it applies to the performance of installation support service work at Kennedy Space Center, Florida, and which governs for its duration the wages, hours and other employment terms at the Kennedy Space Center.

Boeing declined to consider the merits of the grievances, stating in part:

As of April 1, 1971, the date on which Boeing assumed its responsibilities under the Installation Support Services contract, a substantial majority of the bargaining unit employees were from sources other than Trans World Airlines. Therefore, Boeing is of the opinion that it is not a successor to the TWA/IAM[AW] agreement. Furthermore, even if the majority of the Boeing work force was made up of former TWA employees, it is the position of the Boeing Company that a finding of successorship would be precluded because of the substantial change in the employing industry.

Consistent with our position that the contract on which the purported grievances are based has no application to the Boeing Company or any of its operations or activities, we cannot and do not recognize your letter of April 26, 1971, as a grievance and decline to respond to it as such.

During the pendency of this dispute IAMAW informed Boeing that, while it would continue to press for adoption of the TWA-IAMAW agreement, it would utilize the dues deduction authorization cards of Local Lodge 2061 (the IAMAW local affiliated with Boeing) until the issue was resolved. Boeing deducted un-ion dues in accordance with the individual authorizations; instead of transmitting the checked-off dues to Local 2061 pursuant to the authorization, however, Boeing deposited the collected dues in an escrow fund on the ground that IAMAW had refused to recognize the Boeing-IAMAW collective bargaining agreement.

On May 10, 1971, Boeing filed this suit under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, against IAMAW in the United States District Court for the Middle District of Florida, seeking a declaratory judgment that Boeing "is not a successor to and is not bound by the collective bargaining agreement executed by the defendant and Trans World Airlines." IAMAW filed a counter-claim seeking a declaration that Boeing is bound by the terms of the TWA-IAMAW agreement and an order compelling Boeing to arbitrate the grievances submitted by IAMAW, and an order requiring Boeing to remit the dues which the employees had authorized the company to check-off from their wages.

Upon cross-motions for summary judgment, the District Court declared that "Boeing is not a successor and is not bound" by the TWA-IAMAW collective bargaining agreement, and declined to order Boeing to arbitrate the grievances submitted under that agreement. The District Court did, however, require Boeing to remit the dues previously withheld and escrowed. IAMAW appeals the declaration that Boeing is not a successor; Boeing cross-appeals the order that it turn over the checked-off dues. We affirm.

## II

### SUCCESSORSHIP

Had 41 U.S.C. § 353(c) been in effect at the time when the events giving rise to this controversy occurred, this matter would have been much simpler of resolution. That section provides in effect that a government service contractor, such as Boeing, which succeeds to a contract under which it furnishes substan-

tially the same services as its predecessor, shall not pay its employees less than its predecessor paid under its collective bargaining agreement, unless such terms are found by the Secretary of Labor to be substantially at variance with the going rate in the locality.[6] Section 353(c) was not in effect at the time of the events which gave rise to this controversy, however; it was added to the Service Contract Act of 1965, 41 U.S.C. § 351 et seq., by amendment in 1972, 86 Stat. 789.[7] Nor does § 353(c) apply retroactively. We are thus left to the guidance and direction of the developing case law regarding successorship controversies.[8]

Before approaching these cases we note that we cannot rest upon the formal concepts of merger, successorship, or alter egoism developed in fields alien to labor law. In the sprawling workaday world of employer-employee relationships we go to the plant to find human continuity and pragmatic identity of enterprise; we are not pinned by the precisions and precedents fixed and formulated in the law of taxation, securities, or real property.

## A

### GENERAL PRINCIPLES

The district court reasoned in this case, 351 F.Supp. 813, 816, that NLRB v. Burns Int'l Security Servs. Inc., 1972, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61, had established that an employer will

not be bound as a successor to arbitrate under its predecessor's labor contract unless it has employed a majority of its predecessor's personnel; since Boeing did not meet that standard, the district court determined that Boeing was not bound to arbitrate. While we ultimately conclude as well that IAMAW had made out an insufficient case on the law here, we are concerned that the district court has misapprehended *Burns*. Thus, with the. additional benefit of the Supreme Court's opinion in Howard Johnson Co. v. Detroit Local Joint Exec. Bd., 1974, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46, which was undecided at the time of the district court's opinion, we proceed at some length to elaborate our understanding of the relevant case law.

The course through the cases on which the parties dispatch us leads over ground both dense and largely uncharted. This case requires the resolution of difficult issues regarding the contractual freedom and expectations of employers and the expectations and reliance of employees. We determine our conclusions by reference to landmarks set by the Supreme Court; but its positions have been too few to survey the entire landscape, and we explore here a largely shadowed spot.

The reference points which the Supreme Court has established lie chiefly in three cases: John Wiley & Sons, Inc. v. Livingston, 1964, 376 U.S. 543, 84 S. Ct. 909, 11 L.Ed.2d 898; *Burns, supra*;

---

**6.** Section 353(c) provides in terms that

No contractor or subcontractor under a contract, which succeeds a contract subject to this chapter and under which substantially the same services are furnished, shall pay any service employee under such contract less than the wages and fringe benefits, including accrued wages and fringe benefits, and any prospective increases in wages and fringe benefits provided for in a collective-bargaining agreement as a result of arm's-length negotiations, to which such service employees would have been entitled if they were employed under the predecessor contract: *Provided*, That in any of the foregoing circumstances such obligations shall not apply if the Secretary finds after a hear-

ing in accordance with regulations adopted by the Secretary that such wages and fringe benefits are substantially at variance with those which prevail for services of a character similar in the locality.

**7.** The section was, in fact, added by Congress largely in response to the controversy at bar.

**8.** Limited as § 353(c) is to government contracting, we do not read it to express any Congressional statement as to the interpretation of preexisting successorship law in general. Nor do we think that the application of existing successorship case law principles to this case is altered by the fact that the federal government is the primary "employer" here.

and *Howard Johnson, supra.* These three cases not only offer three different perspectives on the successorship problem, but at times they seem to illuminate a different background. Thus, it is necessary to consider them individually and chronologically in order to determine the coordinates of established principles. Indeed, as the Supreme Court has counselled, "In our development of the federal common law [in this area] we must necessarily proceed cautiously, in the traditional case-by-case approach of the common law." *Howard Johnson,* 417 U.S. at 256, 94 S.Ct. at 2240, 41 L.Ed. 2d at 53.

The primary case on which IAMAW relies, and which Boeing seeks to distinguish, is *Wiley, supra,* in which the Supreme Court held that "the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances, . . . the successor employer may be required to arbitrate with the union under the agreement." 376 U.S. at 548, 84 S.Ct. at 914, 11 L.Ed.2d at 904.

In *Wiley* a small publishing house, Interscience, with 80 employees, 40 of whom were union-represented, merged into Wiley, a firm with larger assets and commitments and a premerger total of about 300 employees. Interscience ceased to exist in its own right after the merger, and almost all [9] the 40 union-represented employees of Interscience stayed on with Wiley and were mingled with the existing work force at Wiley's plant, where they pursued the same kind of work as before. The employees' un-

ion and Wiley were unable to agree on the effect of the merger on the existing collective bargaining agreement between Interscience and the union. The union asserted grievances concerning "conditions of employment typically covered by collective bargaining agreements and submitted to arbitration if other grievance procedures fail. Specific provision for each of them [was] made in the Interscience agreement." 376 U.S. at 554, 84 S.Ct. at 916, 11 L.Ed.2d at 907. Wiley refused to arbitrate, however, protesting its freedom from a contract which it had not joined. Ultimately the union sued under § 301 to compel arbitration.

The Supreme Court recognized that ordinary contract law would not bind Wiley to the Interscience agreement. Under § 301, however, the controlling principles were held to be a matter of federal law, to be developed from the policies embedded in the "national labor laws." *See* Textile Workers Union v. Lincoln Mills, 1957, 353 U.S. 448, 77 S. Ct. 912, 1 L.Ed.2d 972. The Court rested its conclusions regarding the requirement of arbitration on two such policies. First:

> [e]mployees, and the union which represents them, ordinarily do not take part in negotiations leading to a change in corporate ownership. The negotiations will ordinarily not concern the well-being of the employees, whose advantage or disadvantage, potentially great, will inevitably be incidental to the main considerations. The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently

---

9. The *Wiley* opinion in the Supreme Court states that all the unionized employees at Interscience "except a few . . . continued in Wiley's employ," 376 U.S. at 545, 84 S.Ct. at 912, 11 L.Ed.2d at 902, and refers to "the wholesale transfer of Interscience employees to the Wiley plant," 376 U.S. at 551, 84 S.Ct. at 915, 11 L.Ed.2d at 905. Since the Supreme Court's opinion, the district court originally hearing the case has stated that "[t]he union in *Wiley* represent-

ed 40 employees in the Interscience plant, 29 of whom went to work for Wiley . . . . ." McGuire v. Humble Oil & Refining Co., S. D.N.Y.1965, 247 F.Supp. 113. However that may be, in *Howard Johnson* the Supreme Court read *Wiley* as a case in which "the surviving corporation hired *all* of the employees of the disappearing corporation." 417 U.S. at 258, 94 S.Ct. at 2241, 41 L.Ed.2d at 56.

to rearrange their business and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship.

376 U.S. at 549, 84 S.Ct. at 914, 11 L. Ed.2d at 904. Second:

> The transition from one corporate organization to another will in most cases be eased and industrial strife avoided if employees' claims continue to be resolved by arbitration rather than by "the relative strength . . . of the contending forces," [United Steelworkers v.] Warrior & Gulf [Navigation Co., 1960], 363 U.S. [574,] at 580, 80 S.Ct. 1347, at 1352, 4 L.Ed.2d [1409,] 1416.
>
> The preference of national labor policy for arbitration as a substitute for tests of strength between contending forces could be overcome only if other considerations compellingly so demanded.

Furthermore, the Court considered that

> a collective bargaining agreement is not an ordinary contract. ". . . [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate . . . . The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant." Warrior & Gulf, *supra*, 363 U.S. at 578–579, 80 S.Ct. at 1351, 4 L.Ed.2d [at 1415]. . . . Central to the peculiar status and function of a collective bargaining agreement is the fact, dictated both by circumstance . . . and by the requirements of the National Labor Relations Act, that it is not in any real sense the simple product of a consensual relationship.

376 U.S. at 550, 84 S.Ct. at 914, 11 L. Ed.2d at 905. "Therefore," the Court concluded,

> although the duty to arbitrate . . . must be founded on a contract, the impressive policy considerations favoring arbitration are not

wholly overborne by the fact that Wiley did not sign the contract being construed. This case cannot readily be assimilated to the category of those in which there is no contract whatever, or none which is reasonably related to the party sought to be obligated. There was a contract, and Interscience, Wiley's predecessor, was party to it. We thus find Wiley's obligation to arbitrate this dispute in the Interscience contract construed in the context of a national labor policy.

376 U.S. at 550–551, 84 S.Ct. at 915, 11 L.Ed.2d at 905 (footnote omitted).

Consonant with its reasoning, the Court limited application of its holding to cases in which there was "substantial continuity of identity in the business enterprise before and after a change," so that the duty to arbitrate was not "something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved." 376 U.S. at 551, 84 S.Ct. at 915, 11 L.Ed.2d at 905.

The broad principle of employee protection against sudden changes in the employment relationship which the Court first sketched in *Wiley* is not, however, the complete picture. Most significantly, the Supreme Court has somewhat shifted its view of the policy framework on which the *Wiley* result hung, as evidenced by its opinion in NLRB v. Burns Int'l Security Servs., Inc., *supra*, on which Boeing relies here.

*Burns* involved an NLRB action to enforce an order requiring a successor employer (1) to recognize and bargain with the union representing its predecessor employer's employees, and (2) to adhere to the collective bargaining agreement which had bound the predecessor employer. The predecessor-successor relationship was of the service contract type involved in the case at bar: on submitting the best bid in an annual rebidding, Burns was chosen to replace its predecessor, Wackenhut, as the supplier of plant protection services for the Lockheed Aircraft Service Co. at a California

airport. When Burns took over the security operation, employing 42 workers, 27 of whom had been with Wackenhut in identical jobs, Burns refused to recognize the United Plant Guard Workers of America (UPG), which had been certified four months earlier as the exclusive bargaining representative of Wackenhut's employees.

The Court's opinion, which turned "to a great extent on the precise facts involved here," 406 U.S. at 274, 92 S.Ct. at 1575, 32 L.Ed.2d at 65 was in two parts.

First, the Court held, 5 to 4, that, assuming the appropriateness of the bargaining unit,

> it was not unreasonable for the Board to conclude that the union certified to represent all employees in the unit still represented a majority of the employees and that Burns could not reasonably have entertained a good-faith doubt about that fact.

406 U.S. at 278, 92 S.Ct. at 1577, 32 L. Ed.2d at 68. Four Justices dissented to this holding on the grounds that a continuing union majority had not been shown with mathematical certainty and that notions of successorship such as underlay *Wiley* ought not apply even to require the union recognition here, given the nature of the predecessor-successor relationship.

Second, the Court held unanimously that Burns was not bound to observe the substantive terms of the Wackenhut-UPG agreement. Stressing the fundamentality of the freedom of contract principle in the national labor laws, *see generally* Howard K. Porter Co. v. NLRB, 1970, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146, the Court emphasized that the existence of a duty to bargain did not enable the Board to bind either side to agree to any particular term of

contract. The Board argued that the interests in the "peaceful settlement of industrial conflicts and 'protection [of] the employees [against] a sudden change in the employment relationship'" 406 U.S. at 285, 92 S.Ct. at 1581, 32 L. Ed.2d at 72, recognized in *Wiley* "require that Burns be treated under the collective-bargaining contract exactly as Wackenhut would have been if it had continued protecting the Lockheed plant." *Id.* The Court found the *Wiley* case distinguishable, however, on two grounds.[10]

First, *Wiley* held only that the agreement to arbitrate survived the merger there, and left for the arbitrator to decide, subject to judicial review, the extent to which the successor employer was bound by the remaining provisions of the predecessor's collective bargaining agreement. In *Burns*, however, arbitration was not in issue, and the interest in labor stability was insufficiently substantial to outweigh the policy against governmental imposition of specific contract terms. Second, the *Burns* Court distinguished the predecessor-successor relationship in the *Burns* annual rebidding situation from that in *Wiley*, which involved

> a merger occurring against a background of state law that embodied the general rule that in merger situations the surviving corporation is liable for the obligations of the disappearing corporation. . . . Here there was no merger or sale of assets, and there were no dealings whatsoever between Wackenhut and Burns. On the contrary, they were competitors for the same work, each bidding for the service contract at Lockheed. Burns purchased nothing from Wackenhut and became liable for none of its fi-

10. The Court also distinguished the posture in which each case was presented. *Wiley* was a § 301 action, while *Burns* arose "in the context of an unfair labor practice proceeding where the board is expressly limited by the provisions of § 8(d)," from requiring that any party "agree to a proposal or . . . [make] a concession, see H. K. Porter Co. v. NLRB," 406 U.S. at 285, 92 S.Ct. at 1581, 32 L.Ed.2d at 72. The Court has subsequently minimized the importance of this consideration, however, *see* Howard Johnson, 417 U.S. at 255, 94 S.Ct. at 2240, 41 L.Ed.2d at 53. *See also* the Supreme Court, 1971 Term, 86 Harv.L.Rev. 50, 255–56 (1972).

nancial obligations. Burns merely hired enough of Wackenhut's employees to require it to bargain with the union . . . . But this consideration is a wholly insufficient basis for implying either in fact or in law that Burns had agreed or must be held to have agreed to honor Wackenhut's collective-bargaining contract. 406 U.S. at 286–287, 92 S.Ct. at 1581, 32 L.Ed.2d at 72.

Whatever the possibility of distinguishing the precise holdings of the two cases, however, there remains a fundamental difficulty in reconciling their approaches, as we have remarked elsewhere, United Steelworkers v. United States Gypsum Co., 5 Cir. 1974, 492 F.2d 713, 725 n. 20, and as the Supreme Court has itself subsequently observed, Howard Johnson, 417 U.S. at 253–259, 94 S.Ct. at 2239–2241, 41 L.Ed.2d at 52–53. Wiley's expansive approach to the reach of a collective bargaining agreement remains in stark contrast to the Burns Court's emphasis on traditional principles of consent to be bound by contract, which emphasis culminated in the statement that "[s]trife is bound to occur if the concessions that must be honored do not correspond to the relative economic strength of the parties." 406 U.S. at 288, 92 S.Ct. at 1582, 32 L.Ed.2d at 73.

The Supreme Court has not yet found it necessary to resolve these differences in approach. We are confident, however, that even at the most Burns has not overruled the principles of Wiley. See e. g., Golden State Bottling Co. v. NLRB, 1973, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (a post-Burns case applying principles of Wiley in enforcing an NLRB unfair labor practice remedy against successor employer, where it had notice of predecessor's unfair labor practice litigation); see United Steelworkers v. United States Gypsum Co., 5 Cir. 1974, 492 F.2d at 725–726.

The matter at bar resembles both Wiley (in that the remedy sought is an arbitration order under § 301) and Burns (in that the link between the predeces-

sor and successor is the tenuous one of replacement under a periodic rebidding service contract arrangement). While we need not determine the precise remaining vitality of Wiley's reach, we are required to measure its application to the matter at hand, in light of the approach more recently adopted by the Supreme Court. In this effort we extract some guidance from the Court's most recent discussion of these issues in Howard Johnson, supra. There Howard Johnson leased the real property and purchased the remaining assets of a restaurant and motor lodge of one of its franchisees, and proceeded to operate the unit itself. Determining to establish its own work force, Howard Johnson hired 45 employees, only 9 of whom had been its former franchisee's personnel. The union which had represented the former franchisee's work force and entered into a collective bargaining agreement with the former franchisee brought a § 301 action to compel arbitration under the predecessor's bargaining agreement; its principal grievance was that Howard Johnson was obligated under that contract to continue the employment of all of the franchisee's employees because they had not been discharged in accordance with the terms of the union-franchisee contract.

While the Howard Johnson Court explicitly declined to resolve the differences between Wiley and Burns, it did make three points significant here. First, it established that Wiley should be read restrictively, as a "guarded, almost tentative statement," 417 U.S. at 256, 94 S.Ct. at 2240, 41 L.Ed.2d at 53. Second, it held that even under Wiley the arbitration sought could not be ordered because of the lack of "substantial continuity of identity in the business enterprise," which requirement it read to include a showing of a "substantial continuity in the identity of the work force across the change in ownership." 417 U.S. at 259, 94 S.Ct. at 2241, 41 L.Ed.2d at 57. Third, the Court articulated the balance which must be struck in determining whether an employer is obliged

to fulfill any given obligation of "successorship";

> The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of "successor" which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others.

417 U.S. at 262 n. 9, 94 S.Ct. at 2243, 41 L.Ed.2d at 56–57.[11]

## B

### SUBSTANTIAL CONTINUITY IN THE IDENTITY OF THE BUSINESS ENTERPRISE

The Supreme Court opinions are consistent on the one proposition that there is no simple checklist for decision; none could exhaust the factors relevant to determining whether a successor employer is bound to arbitrate under its predecessor's contract. We are in essence called upon to pragmatize the corporate and la-

bor relationships to determine whether the past is part of the present, or the present the beginning of tomorrow. In a given case it may be clear that some one indicator of continuity is so weak as to allow a simple conclusion of no duty to arbitrate; but in more closely balanced cases, ownership, contracts terminated and germinated, purity and impurity of motives, and an encyclopedia of other variables must be equiponderated. We conclude here that despite the fact that there is no doubt on this record that Boeing has pursued its business in a manner substantially congruent to TWA's patterns,[12] *Boeing* cannot be ordered in this § 301 action to arbitrate IAMAW's grievances under the TWA–IAMAW contract, given (1) the extent of the continuity in the identity of the work force across the change in employers, and (2) the relation between Boeing and TWA themselves.

### *Continuity in the Identity of the Work Force*

■ *Howard Johnson* establishes that "continuity of identity in the business enterprise necessarily includes . . . a substantial continuity of identity of the work force across the change in ownership." 417 U.S. at 263, 94 S.Ct. at 2244, 41 L.Ed.2d at 46.[13] We do not

11. The *Howard Johnson* Court also concluded that even were arbitration required of Howard Johnson, hiring of predecessor employees could not be, since it determined that the requirement of hiring any particular one or number of a predecessor's employees to be "completely at odds with the basic principles [of employer freedom to contract which] this Court elaborated in *Burns*." 417 U.S. at 261, 94 S.Ct. at 2243, 41 L.Ed.2d at 56. In light of the way in which we resolve this case, we need not consider this phase of the *Howard Johnson* opinion.

12. *Wiley, supra;* Note, The Successor Employer's Duty to Arbitrate: A Reconsideration of John Wiley & Sons, Inc. v. Livingston, 82 Harv.L.Rev. 318, 341 (1968). *See* Wackenhut Corp. v. International, Plant Guard Workers, 9 Cir. 1964, 332 F.2d 954. *See also, e. g.,* United States Gypsum Co. v. United Steelworkers, 5 Cir. 1967, 384 F.2d 38, 41, cert. denied, 1968, 389 U.S. 1042, 88 S.Ct. 783, 19 L.Ed.2d 832; United

Steelworkers v. Reliance Universal, 3 Cir. 1964, 335 F.2d 891, 893; Joint Bd., Dressmakers Union v. Senco, Inc., D.Mass.1970, 310 F.Supp. 539, 544; Retail Clerks Local No. 1552 v. Lynn Drug Co., S.D.Ohio, 1969, 299 F.Supp. 1036, 1039–1040; International Bhd. Pulp, Workers v. Great Northwest Fibre Co., E.D.Wash., 1965, 263 F.Supp. 167, 169; Local Joint Exec. Bd., Hotel, Employees v. Joden, Inc., D.Mass., 1966, 262 F.Supp. 390, 396.

13. There is no suggestion, however, that retention of a predecessor's employee is in itself a sufficient basis on which to found an obligation under § 301 to arbitrate; if, for example, a successor employer radically changed the type of product manufactured and the ways of doing business of a plant and retained the former employer's personnel solely in order to preserve stability in the local economy, we expect that the successor would not be obliged to arbitrate under his predecessor's contract.

think that any precise definition of "substantiality" in work force continuity can be distilled from the particular language of *Howard Johnson,* however. The Court found support for its "substantial" standard in the "wholesale transfer" of employees from predecessor to successor in *Wiley* [14] and from "the emphasis most of the lower courts have placed on whether the successor employer hires a majority of the predecessor's employees in determining the legal obligations of the successor in § 301 suits under Wiley" 417 U.S. at 263, 94 S.Ct. at 2244, 41 L.Ed.2d at 46. We believe that these statements in *Howard Johnson* are descriptive rather than prescriptive and do not, in themselves, establish any "majority" criterion, such as Boeing argues in favor of here.[15] IAMAW argues in the other direction that the Supreme Court's enunciation of a "substantiality" test when it might have adopted a "majority" standard establishes that a "majority" employee continuity cannot be prerequisite to a duty to arbitrate. We find this argument as unimpressive as its rejected converse. Rather, we regard the Supreme Court's emphasis in *Howard Johnson* of the necessity for pursuing a "traditional case-by-case approach" in this area, 417 U.S. at 256, 94 S.Ct. at 2240, 41 L.Ed.2d at 53, as an assurance that it intended to establish no precise benchmark at this stage in the law's development, even assuming that a strict standard would ever be appropriate.

### Computation of Continuity in the Identity of the Work Force

Boeing argues, and IAMAW denies, that even if the Supreme Court has not committed itself to any precise definition of "substantiality," case law from the lower courts establishes "majority status" as the test of substantial continuity in the identity of the work force. Before addressing the appropriateness of a "majority" standard, we consider what group it is that this "majority" is to be computed from: that is, whether the more significant factor in determining the continuity in the identity of the work force for the purpose of determining whether a successor employer must arbitrate under its predecessor's contract is the percentage of the predecessor's employees who have continued to work for the successor, or whether it is the percentage of the successor's employees who had earlier worked for the predecessor.[16]

The parties here have debated the substantiality of the continuity in the identity of the work force largely in terms of the 39% of Boeing's employees who had worked for TWA. We conclude, however, that the percentage of TWA employees who became Boeing employees, which we determine to be about

---

14. *But see* note 9 *supra.*

15. None of the cases cited in the *Howard Johnson* opinion (save the district court opinion in the matter *sub judice,* which we determine in any event to have been the product of a misapprehension of *Burns*) articulates a general standard for the quantum of employee continuity prerequisite to an order the arbitrate under a predecessor's contract. Indeed, in one of the cited cases, Local Joint Exec. Bd., Hotel, Employees v. Joden, Inc., D.Mass.1966, 262 F.Supp. 390, a duty to arbitrate was found despite the fact that (contrary to the Supreme Court's apparent reading of the case) a majority of the predecessor's employees were *not* retained by the successor (12 of "29 or 30" were retained).

16. The differences between the two majorities are illustrated by the facts of Local Joint Exec. Bd., Hotel, Employees v. Joden, Inc., D.Mass.1966, 262 F.Supp. 390, 392: "Prince [the predecessor] was employing twenty-nine or thirty people. Of these thirty, Joden [the successor] retained twelve to make a total complement of eighteen or nineteen people working for Joden . . . ." Thus, the percentage of the predecessor's employees who remained at the restaurant was 12/30 = 40%; while the percentage of the successor's employees who had been working for the predecessor was 12/18 or 12/19 = 67% or 63%.

35%, is the more significant figure in considering whether Boeing is obliged to arbitrate under the TWA–IAMAW contract.

To begin with, the showing of employee continuity is relevant in establishing "the continuity of identity in the business enterprise." As a matter of principle, since the duty to arbitrate arises from an application of the contract between the predecessor employer and his organized employees, the entity whose identity is to be the reference point for judging continuity ought to be the predecessor enterprise. Accordingly, in judging the continuity in the identity of the work force, the incumbent component of the successor's work force ought to be compared against the predecessor's staff, not the successor's.[17]

This method of computation is consistent with the Supreme Court's opinions. In *Wiley* the Court required arbitration where the predecessor's employees comprised a much smaller percentage of the successor's employees after the merger (40 of 340 = 12%) than the corresponding ratio in *Howard Johnson* (9 of 45 = 20%), in which no arbitration was required. Rather, the *Howard Johnson* Court found it most significant that "in *Wiley* the surviving corporation *hired all of the employees of* *the disappearing corporation,*" 417 U.S. at 258, 94 S.Ct. at 2241, 41 L.Ed.2d at 54 (emphasis altered). Moreover, it found support for its conclusion in what it perceived to be "the emphasis most of the lower courts have placed . . . in determining the legal obligations of the successor in § 301 suits under Wiley" on the percentage of the predecessor's employees hired by the successor employer, 417 U.S. at 263, 94 S.Ct. at 2244, 41 L.Ed.2d at 57.

Thus, while the figure most significant in determining the successor's duty under *Burns* to bargain with the union representing the predecessor's organized employees may be [18] the percentage of the successor's employees who are incumbents from the predecessor, *see e. g.,* *Burns,* 406 U.S. at 279, 92 S.Ct. at 1577, 32 L.Ed.2d at 68; Emerald Maintenance, Inc., 5 Cir. 1972, 464 F.2d 698, 701; Goldberg, The Labor Law Obligations of a Successor Employer, 63 Nw. U.L.Rev. 735, 793–794 (1969), we find those cases—where the basic question to be resolved by examination of employee continuity is simply whether the union represents a majority of the successor's employees, *see Burns,* 406 U.S. at 278–281, 92 S.Ct. at 1577–1579, 32 L.Ed.2d at 68–69; NLRB v. Auto Ventshade, Inc., 5 Cir. 1960, 276 F.2d 303,

17. Additionally, the percentage representing those of the predecessor's employees who were retained by the successor decreases according to the successor's trimming of his total work force, while the figure representing the percentage of the successor's employees who are incumbents increases as the size of the successor's total work force diminishes. (Where the total employee complement is the same under both predecessor and successor the percentages will be equal.) Since a net decrease in the total number of personnel indicates a lesser continuity in the identity of the business enterprise, the percentage of the predecessor's employees remaining with the successor seems a better general indicator of the enterprise continuity.

18. The cases do not always consider which ratio is most significant. *See* Note, Contract Rights and the Successor Employer: The Impact of *Burns Security,* 71 Mich.L. Rev. 571, 575 n. 35 (1973). *Compare* *Burns,* 406 U.S. at 281, 92 S.Ct. at 1579, 32 L.Ed.2d at 68 ("a majority of the employees hired by the new employer") *with* the Supreme Court's later recitation of *Burns,* Golden State Bottling Co. v. NLRB, 414 U. S. at 184, n. 6, 94 S.Ct. at 425, 38 L.Ed.2d at 402 ("a majority of [the predecessor's] employees"). No doubt a large part of this obscurity is owing to the fact that in the case—probably the usual case—where the predecessor and successor employ the same number of personnel or close to the same number, the figures will be the same or close, so that it does not matter which figure is consulted. *See, e. g.,* NLRB v. Zayre Corp, 5 Cir. 1970, 424 F.2d 1159; NLRB v. Wayne Convalescent Center, Inc., 6 Cir. 1972, 465 F.2d 1039; NLRB v. Interstate 65 Corp., 6 Cir. 1971, 453 F.2d 269, 273.

307—unpersuasive examples in this context.[19]

### Regarding "Majority" Work Force Continuity

Having established the reference point from which to compute the ratio of substantial continuity in identity of the work force, we turn to the substance of the question: whether the fact that Boeing hired only about 35% of the incumbent TWA work force determines that Boeing is not obligated to arbitrate under its predecessor's contract.

We are not prepared at this point in the development of the law of successor employers' obligations to arbitrate either to accept or to reject Boeing's argument that "majority status" is prerequisite to the obligation to bargain. In the first place, as we have already expressed, we do not find that the Supreme Court has established any benchmark. Furthermore, we are convinced that reliance on bargaining cases, such as *Burns*, is misplaced. There is much, though not unanimous, authority for the proposition that a successor employer will be required to bargain with the union representing his predecessor's employees only when predecessor's personnel comprise a majority of the successor's work force.[20] But the federal labor law policies underlying such conclusions are analytically distinct from those involved in succes-

sorship arbitration suits under § 301. The majority requirement in duty to bargain cases is premised upon notions of majority selection of organized employees' collective bargaining agents. In the duty to arbitrate cases under § 301, however, the incumbent employees fulfill no such representative function in the filing of their grievances.[21] Thus, in *Wiley* the Supreme Court noted that its finding of Wiley's duty to arbitrate did "not suggest any view on the questions surrounding a certified union's claim to continued representative status. This union . . . seeks to arbitrate claims based on [its contract with the predecessor employer], not to negotiate a new agreement," and stated that "[t]he fact that the Union does not represent a majority of an appropriate bargaining unit in Wiley does not prevent it from representing those employees who are covered by the agreement which is in dispute and out of which Wiley's duty to arbitrate arises." 376 U.S. at 551 and n. 5, 84 S.Ct. at 915, 11 L.Ed.2d at 905. To the same effect, we have upheld a successor employer's duty to arbitrate with a union which had once represented the predecessor's employees, but lost its certification. United States Gypsum Co. v. United Steelworkers, 5 Cir. 1967, 384 F.2d 38, 47.

For the purpose of resolving this case, however, we need not decide whether the

19. Our conclusion as to which ratio is more significant in determining whether a successor is obliged to arbitrate does not, of course, preclude all consideration of the other ratio. For example, an arbitrator may consider that the work force of an absorbed enterprise has been diffused in such a way as to preclude the application of the predecessor's collective bargaining agreement. *See Howard Johnson*, 417 U.S. at 258, n. 4, 94 S.Ct. at 2241, 41 L.Ed.2d at 54.

20. The *Burns* opinion speaks in inclusive, not exclusive, terms, holding that "where the bargaining unit remains unchanged and a majority of the employees hired by the new employer are represented by a recently certified bargaining agent there is little basis for faulting the Board's" ordering the employer to bargain. 406 U.S. at 281, 92 S.Ct. at 1579, 32 L.Ed.2d at 69. Nevertheless, it is clearly established by the vast majority of

cases that the Board will generally impose a duty to bargain only where a majority of the successor's personnel are incumbents from the predecessor work force. *See generally* Goldberg, The Labor Law Obligations of a Successor Employer, 63 Nw.U.L.Rev. 735, 793–799 (1969); Note, *supra* note 18, at 575 n. 38. *See also* Emerald Maintenance, Inc. v. NLRB, 5 Cir. 1972, 464 F.2d 698, 670. A majority, while necessary, is not necessarily sufficient, however, *see* cases summarized in Slicker, A Reconsideration of the Doctrine of Employer Successorship—A Step Toward a Rational Approach, 57 Minn.L.Rev. 1051, 1055 n. 15 (1973).

21. Indeed, this distinction is evident in the differences in the reference points from which the relevant majority of employees requisite to establishment of the employer's duty are to be computed.

principles underlying the *Howard Johnson* requirement of a substantial continuity in the identity of the work force is to be read as a generally applied "majority" standard.[22] We conclude only that the continuity in the identity of the work force must be considered together with other indicia of enterprise continuity, and turn to a consideration of those factors.

### Nature of the TWA–Boeing Relationship

It is well established that the principle of *Wiley* applies to corporate successorships accomplished through purchase and sale rather than merger.[23] We consider here the extent to which the *Wiley* test of continuity in the identity of the business enterprise can be satisfied in a periodic rebidding service contract context—"hardly . . . a typical successorship situation."[24]

We begin by distinguishing the cases finding sufficient continuity in the "employing industry"[25] to support a duty to recognize and bargain with the predecessor employees' union in such a context.[26] The focus in these duty to bargain cases being whether "the unit still represent[s] a majority of the employees," *Burns*, 406 U.S. at 278, 92 S.Ct. at 1577, 32 L.Ed.2d at 68, the primary consideration is naturally the work force continuity. *See generally* Goldberg, *supra* note 20, at 793–799. As a secondary matter, attention is given to whether the successor's "operational structure and practices differed from those of [the predecessor, so that the successor's] bargaining unit was no longer an appropriate one." *Burns*, 406 U.S. at 280, 92 S.Ct. at 1578, 32 L.Ed.2d at 68. *See* Emerald Maintenance Inc. v. NLRB, 5 Cir. 1972, 464 F.2d 698, 701–702. *See, e. g.,* NLRB v. Alamo White Truck Service, 5 Cir. 1959, 273 F.2d 238. *See generally* Goldberg, *supra* note 20, at 799–806. Thus, the nature of the predecessor-successor relationship is of relatively minor significance.

**22.** We have discovered no case (save the district court opinion below) holding that a successor employer's retention of a majority of its predecessor's personnel is prerequisite to the finding of a duty to arbitrate under the predecessor's contract. *But cf. Howard Johnson*, 417 U.S. at 263–264 and n. 10, 94 S. Ct. at 2244, 41 L.Ed.2d at 57; Retail Clerks Local No. 1552 v. Lynn Drug Co., S.D. Ohio 1969, 299 F.Supp. 1036. One case has ordered arbitration despite the successor's taking only a minority of the predecessor's employees, Local Joint Exec. Bd., Hotel, Employees v. Joden, Inc., D.Mass.1966, 262 F.Supp. 390. *See also* Monroe Sander Corp. v. Livingston, 2 Cir. 1967, 377 F. 2d 6, cert. denied, 1967, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89; *but see also* Printing Specialties, etc., Union No. 447 v. Pride Papers Aronson Bros. Paper Corp., 2 Cir. 1971, 445 F.2d 361, 364 n. 1, cert. denied, 1971, 404 U.S. 1001, 92 S.Ct. 564, 30 L.Ed. 2d 553; Owens-Illinois, Inc. v. District 65, Retail Store Union, S.D.N.Y.1967, 276 F. Supp. 740, 743, aff'd on district court opinion, 2 Cir. 1968, 393 F.2d 932. *Cf. also* International Bhd. Pulp, Workers v. Great Northwest Fibre Co., E.D.Wash.1965, 263 F.Supp. 167, 168 ("significant number of former employees"). Some commentators argue that a majority need not be required, *see* Goldberg, *supra*, note 20, at 750 n. 52; Note, *supra*, note 12, at 430. *But see* Note,

Contractual Successorship: The Impact of *Burns*, 40 U.Chi.L.Rev. 617, 621 n. 20 (1973), cited with approval, *Howard Johnson*, 417 U.S. at 264, n. 10, 94 S.Ct. at 2244, 41 L.Ed.2d at 57.

**23.** *See* Golden State Bottling Co. v. NLRB, 1973, 414 U.S. at 182, n. 5, 94 S.Ct., at 424, 38 L.Ed.2d at 402; United States Gypsum Co. v. United Steelworkers, 5 Cir. 1967, 384 F.2d 38, 43–44, cert. denied, 1968, 389 U.S. 1042, 88 S.Ct. 783, 19 L.Ed.2d 832.

**24.** St. Antoine, Judicial Caution and the Supreme Court's Labor Decisions, October Term 1971, U.Mich.J.L.Ref. 269, 270 (1973).

**25.** *See* Golden State Bottling Co. v. NLRB, 414 U.S. at 182 n. 5, 94 S.Ct. at 424, 38 L. Ed.2d at 402; Emerald Maintenance, Inc. v. NLRB, 5 Cir. 1972, 464 F.2d 698; NLRB v. Zayre Corp., 5 Cir. 1970, 424 F.2d 1159; NLRB v. Auto Ventshade, Inc., 5 Cir. 1960, 276 F.2d 303; NLRB v. Colten, 6 Cir. 1939, 105 F.2d 179, 183.

**26.** *See, e. g., Burns*, 406 U.S. at 278–281, 92 S.Ct. at 1577–1579, 32 L.Ed.2d at 67–69; Emerald Maintenance, Inc. v. NLRB, 5 Cir. 1972, 464 F.2d 698. *See also, e. g.,* NLRB v. Geronimo Service Co., 10 Cir. 1972, 467 F.2d 903; Maintenance, Inc., 1965, 148 N.L. R.B. 1299; *see generally* Slicker, *supra* note 20, at 1062–1063. *Cf. also* Eastman Kodak Co., 1971, 194 NLRB No. 27.

In the duty to arbitrate context, however, it is the continuity in identity of the *enterprise* which makes the duty to arbitrate under the predecessor's collective bargaining agreement "reasonably related to the party sought to be obligated," and not "something imposed from without," *Wiley,* 376 U.S. at 550–551, 84 S.Ct. at 915, 11 L.Ed.2d at 905; and the "continuity in the identity of the work force across the change in ownership" constitutes only a necessary but insufficient part of the enterprise continuity. *Howard Johnson.* Thus we think the relationship between the predecessor and successor employers far more critical here than in the duty to bargain cases.

While we recognize that the Supreme Court spoke in *Howard Johnson* of substantial continuity in the identity of the work force across the change in *ownership,* we do not regard that oblique reference as a conclusion that a successor's duty to arbitrate under § 301 depends on a merger or purchase and sale connection between the predecessor and successor. Nor do we think that the *Burns* majority's "studious" avoidance of the term "successor," [27] while a significant gesture, should be taken to conclude the Supreme Court's thinking on the matter. More important, however, is the *Burns* Court's emphasis of the tenuous quality of the enterprise continuity in denying the application of substantive contract terms in *Burns:*

> Wiley['s] . . . [narrow] holding dealt with a merger occurring against a background of state law that embodied the general rule that in merger situations the surviving corporation is liable for the obligations of the disappearing corporation. . . . Here there was no merger or sale of assets,

and there were no dealings whatsoever between Wackenhut and Burns. On the contrary, they were competitors for the same work, each bidding for the service contract at Lockheed. Burns purchased nothing from Wackenhut and became liable for none of its financial obligations. Burns merely hired enough of Wackenhut's employees to require it to bargain with the union . . . .. But this consideration is a wholly insufficient basis for implying either in fact or in law that Burns had agreed or must be held to have agreed to honor Wackenhut's collective bargaining contract. 406 U.S. at 286, 92 S.Ct. at 1581, 32 L. Ed.2d at 72.[28] This factor was not, however, the critical basis of *Burns* conclusion that the service contract there was not bound to the terms of its predecessor's contract. Indeed, commentators have stressed that the most significant consideration in the Supreme Court's conclusion was the inflexibility of the nonarbitrated enforcement of the precise and entire substance of the predecessor's contract through the NLRB's mechanisms.[29] Nevertheless, we recognize that continuity in the identity of the business enterprise is more strongly shown where the predecessor employer-successor employer relationship is one of purchase and sale, or merger, than in this replacement-under-periodic-rebidding situation.

■ We are not prepared at this stage in the development of successorship principles, however, to say—when we need not do so to resolve this case—that there cannot be "any substantial continuity of identity in the business enterprise" in the absence of a transfer of ownership of tangible assets between

---

27. *See* 406 U.S. at 296, 92 S.Ct. at 1586, 32 L.Ed.2d at 78 (Rehnquist, J.).

28. *Cf. also* Tri-State Maintenance Corp. v. NLRB, 1968, 132 U.S.App.D.C. 368, 408 F. 2d 171.

29. *See generally* Note, *supra* note 18, at 576–579; Note, *supra* note 10, at 256–258; Note, *supra* note 22, at 624–631. *But see* St. Antoine, *supra* note 24, at 273–276.

This was substantially the difficulty recognized by the Labor Board in Emerald Maintenance, Inc., 1971, 188 N.L.R.B. 876, 878, enforced in part, 5 Cir. 1972, 464 F.2d 698, in which, prior to *Burns,* it questioned the applicability in some circumstances of its own doctrine of applying contractual terms against a successor employer in the periodic rebidding context.

employers, even when the most substantial assets involved in both the predecessor and successor enterprises may be the relationship to the primary employer and the collection of the work force, both of which have passed from the predecessor to the successor employer.[30] Rather, in keeping with the case-by-case approach the Supreme Court has advised, we conclude at this time only that where the relationship betwen the predecessor and successor employers is one of replacement in the periodic rebidding context, so that demonstration of continuity in the identity of the enterprise depends completely upon the continuity of the employee complement, the continuity in the identity of the work force must be more substantially established than would be required were the relationship between the predecessor and successor employers one of merger, or purchase and sale.

This conclusion is consistent with the *Howard Johnson* Court's injunction that *Wiley* ought to be expanded only with caution, and with the *Wiley* Court's balancing of employee interests in protection from "a sudden change in the employment relationship" (which exists regardless of the form of employer substitution), against the "rightful prerogative of owners independently to rearrange their businesses." 376 U.S. at 549, 84 S.Ct. at 914, 11 L.Ed.2d at 904.[31] We regard the substantiality of continuity from neither the employers' nor the employees' standpoint alone.[32]

### Conclusion

■ We hold, then, that given the nature of the relation between TWA and Boeing, the extent of the continuity in the identity of the work force established here is not sufficiently substantial to oblige Boeing under § 301 to arbitrate under its predecessor's contract. *Howard Johnson,* 417 U.S. at 263–264, 94 S.Ct. at 2244, 41 L.Ed.2d at 58. *Cf.* Hoisting, Eng'rs Local, 701 v. Pioneer Constr. Co., D.Or.1970, 313 F.Supp. 753.[33] In this conclusion we do

---

30. *Compare* St. Antoine, *supra* note 24, at 273, *with* Goldberg, *supra* note 20, at 748–750.

31. There may also be third party interests at stake in this periodic rebidding service contract context: those of the primary employer. It is not clear, however, that those interests cannot be adequately protected through the flexible mechanisms of arbitration or otherwise. Furthermore, to hold that a successor in this context is never bound to abritrate may be to interfere with the bidding process itself by establishing a favored competitive position for any outsider. Of course the lack of sufficient notice of preexisting collective bargaining agreement may free a successor employer in this context from any duty under its predecessor's contract. *See Wiley,* 376 U.S. at 551, 84 S.Ct. at 915, 11 L.Ed.2d at 905.

32. *See Howard Johnson,* 417 U.S. at 262, n. 9, 94 S.Ct. at 2243, 41 L.Ed.2d at 56–57; Retail Store Employees Local No. 954 v. Lane's of Findlay, Inc., N.D.Ohio 1966, 260 F.Supp. 655, 659; Drivers Local No. 75 v. Wisconsin Employment Relations Bd., 1965, 29 Wis.2d 272, 279, 138 N.W.2d 180, 184.

33. IAMAW argues against this conclusion that to determine the continuity of identity of the work force, as we have done, by reference to the quantum of employees who actually were hired by Boeing, rather than by the number who would have signed on with Boeing had Boeing initially offered a contract identical to TWA's, is incorrect, since it allows Boeing to avoid the contract in the end by simply ignoring it in the beginning. We are not convinced. We do not think that a successor in Boeing's shoes can be required to assume its predecessor's contract even before it is established that it will succeed in lacing up its predecessor's work force. *Burns,* 406 U.S. at 287–288, 92 S.Ct. at 1582–1583, 32 L.Ed.2d at 73. Moreover, the rationale behind the requirement of demonstrating a substantial continuity in the identity of the work force in order to make out a case of substantial continuity of the enterprise is, as we have understood it, to establish that an employer's *securing* the continuity in the work force is a factor to be considered in determining the continuity of the enterprise. It is quite apparent that Boeing did not ultimately secure a sufficiently substantial continuity of the work force here, although at one point Boeing expected

not pretend to have harmonized the law; such would be beyond the range of any single opinion, given the variety of relevant factors. We have simply improvised a tune with which to develop the established themes, and followed past scores to avoid discord.

## III

## CHECK-OFF PROVISION

The district court ordered Boeing to turn over to IAMAW (with interest) the union dues of its IAMAW-member employees which Boeing had checked-off and escrowed.[34] Boeing cross-appeals this part of the district court's order, arguing that where there is no collective bargaining agreement applicable to Boeing (1) that it is not obligated to deduct dues for the benefit of IAMAW; and (2) that to remit any such checked-off dues to IAMAW violates § 302(a) of the Labor Management Relations Act, 29 U.S.C. § 186(a).[35]

We need not consider the correctness of Boeing's legal conclusions here, however, for we determine that its premise is unsupported; we find that there is a labor contract applicable to Boeing. "Boeing contends that the Boeing-IAMAW agreement is controlling." Reply Brief for Plaintiff-Appellee-Cross Appellant at 4. IAMAW contends that if the TWA-IAMAW contract does not control here, then the Boeing-IAMAW contract does. The district court correctly observed that "there is no evidence that anyone has challenged IAM[AW] as the collective bargaining agent for the Boeing support services employees—the whole dispute has centered around *which contract* was applicable." 351 F.Supp. at 816. With our holding here that Boeing is obliged neither to adhere to nor to arbitrate under the TWA-IAMAW collective bargaining agreement, that dispute is resolved, and

to inherit the bulk of TWA's staff and undoubtedly it thought it could benefit from having the experienced personnel. Nor is there any suggestion in this case that Boeing discriminated against TWA incumbents, as the opinion below makes clear, 351 F.Supp. at 815. *See generally Howard Johnson*, 417 U.S. at 262, n. 8, 94 S.Ct. at 2243, 41 L.Ed.2d at 56; *Burns*, 406 U.S. at 280 n. 5, 92 S.Ct. at 1578, 32 L.Ed.2d at 69. We hold that where, as in the circumstances of this case, the employee complement is perhaps the prime identity link between the successor and predecessor employers, a successor employer cannot be forced under § 301 to arbitrate under its predecessor's contract when the successor did not take the necessary steps to secure his enjoying, and consequently did not enjoy, a sufficiently substantial continuity in the identity of the work force.

In light of this conclusion, we need not consider the relevance, if any, to the resolution of IAMAW's rights against Boeing, of the continuing existence of TWA. *Cf.* Goldberg, *supra* note 20, at 754–755; *but cf. also Howard Johnson*, 417 U.S. at 257, 94 S.Ct. at 2241, 41 L.Ed.2d at 54. Nor need we consider Boeing's argument that since the TWA-IAMAW contract's arbitration clause was designed to conform to the mechanisms of the Railway Labor Act, it could not be applied against Boeing.

34. The district court also ordered
    IAM[AW] and Local Lodge 2061 [to] deliver simultaneously with the payments . . . a hold harmless and indemnity agreement, wherein each . . . agrees to indemnify and hold Boeing harmless from any losses by Boeing because of the payment to Lodge 2061 of the escrowed dues arising from a final finding that IAM[AW] was not the collective bargaining agent for the employees from whom such dues were collected.
    351 F.Supp. at 816–817. This part of the order is not in controversy.

35. Section 302(a) generally prohibits payments by an employer to a labor union. Section 302(c)(4) provides, however, that that general prohibition
    shall not be applicable . . . with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided*, That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner . . . .

    Boeing's argument is that this exception to § 302(a) does not apply, because the proviso is unsatisfied.

Boeing's argument is left without any foundation.

The judgment and order entered below are

Affirmed.