REVISED, April 8, 1998

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 97-50570
Summary Calendar
_____

FORT HOOD BARBERS ASSOCIATION;
HENRY TORREZ, JR.; and GILBERT
BARRATACHEA,

                                        Plaintiffs-Appellants,

versus

ALEXIS M. HERMAN, Secretary,
United States Department of Labor
and Any Successor; and NILA STOVALL,
Chief of the Branch of Service
Contract Wage Determination of
the United States Department of
Labor, and Any Successor,

                                        Defendants-Appellees,

GINO MORENA ENTERPRISES,

                                        Intervenor.

_____

Appeal from the United States District Court
for the Western District of Texas
_____
March 30, 1998

Before WIENER, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:

        Plaintiffs-Appellants Fort Hood Barbers Association, Henry

Torrez, Jr., and Gilbert Barratachea (collectively plaintiffs)

appeal from the district court's grant of summary judgment in favor

of Defendants-Appellees Alexis M. Herman, Secretary of the United

States Department of Labor and any successor, Nila Stovall, Chief

of the Branch of Service Contract Wage Determination of the United States Department of Labor and any successor, and Intervenor Gino Morena Enterprises (collectively defendants), affirming the decisions of the Department of Labor's Administrator of the Wage and Hour Division and the Administrative Review Board. Plaintiffs contend that the district court erred in concluding that (1) the McNamara-O'Hara Service Contract Act (SCA)[1] does not require the application of wages and fringe benefits from a pre-existing collective bargaining agreement to the full term of a successor contract, and (2) the Department of Labor did not act arbitrarily or capriciously in holding that plaintiffs' administrative challenge to the Department's 1993 wage determination was untimely.

Following a de novo review of the record, the arguments of counsel in the appellate briefs, and especially the thorough explication of the district court in its order of May 14, 1997, we conclude that the district court did not err in awarding summary judgment on these claims. We agree with the district court that this is an extremely close case. Considering the deference due the Department's regulatory approach[2] —— implemented pursuant to specific statutory authority —— and its interpretation of its own regulations,[3] however, we are satisfied that the district court reached the correct conclusion. Moreover, as the Secretary's brief notes, adoption of the plaintiffs' position would create

---

[1] 41 U.S.C. §§ 351-358 (1992).

[2] See Auer v. Robbins, 117 S. Ct. 905, 909 (1997); Clark v. Unified Servs., Inc., 659 F.2d 49, 52 (5th Cir. 1981).

[3] Auer, 117 S. Ct. at 911.

disincentives for collective bargaining.[4]  As the district court's

order provides a comprehensive, well-reasoned analysis of these

issues, we adopt that court's opinion as our own and append a copy

hereto.  Accordingly, the order of the district court is, in all

respects,

AFFIRMED.


ENDRECORD

---

[4]The facts of this case aptly illustrate how a collective bargaining process may be undercut: Plaintiffs had a collective bargaining agreement (CBA) with the prior contractor to Gino Morena Enterprises (Morena).  After Morena won the contract, the CBA lasted through the first year of Morena's contract before expiring, and, as section 4(c) of the SCA mandates, the CBA's provisions applied to the first year of the Morena contract.  Plaintiffs and Morena were unsuccessful in reaching a new CBA, so that at the time of the 1993 wage determination of which the plaintiffs complain, no CBA was in effect.  Because the expired CBA was more advantageous to the plaintiffs than the 1993 wage determination, they now want the CBA terms to apply to the entire, five-year duration of the Morena contract.  If section 4(c) were to create such a result for the entire duration of the successor contractor, the successor contractor (here, Morena) and the union would have little incentive to negotiate a new CBA; the party relatively advantaged by the existing or lapsed CBA (here, the plaintiffs) could obstruct collective bargaining and insist that the expired CBA continue for the duration of the contractor's contract, thereby receiving a better bargain than it could negotiate for itself.  By contrast, section 4(d) of the SCA and the Secretary's regulation in question, 29 C.F.R. § 4.145(b), partially ameliorate the disincentives to collective bargaining by providing for biannual wage determinations and for each two-year period to be treated as a "wholly new contract[]," at least where no CBA exists, thereby forcing the parties to bargain or to pay and receive the prevailing wage rate. Further, as the district court opinion correctly notes, § 4.145(b) actually benefits workers in situations in which they receive less than the prevailing wage rate by creating "new" service contracts and hence, upward adjustments in their wages every two years.

3

APPENDIX


ORDER


Before the Court are Plaintiffs' Motion for Summary Judgment [# 16], Defendants' Response to Plaintiffs' Motion for Summary Judgment and Cross Motion for Summary Judgment [# 23], Plaintiffs' Reply to Defendants' Response to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment [# 19], Gina Morena Enterprise's Supplemental Response [# 26], Plaintiffs' Letter Brief Filed February 6, 1997[# 25], Defendants' Letter Brief received by the court February 13, 1997, Plaintiffs' Letter Brief received by the Court February 20, 1997, and Defendants' Letter Brief received by the court February 21, 1997. Rarely does clarity shine its calming face in a case with briefing of such order of magnitude, and this case is certainly no exception.[5]

## Contours of the Dispute

Plaintiff Association represents barbers working at Fort Hood, Texas. The other plaintiffs are members of the Association. In 1988, the barbers were employed at Fort Hood by Ollie Weaver Enterprises ("Weaver"). On July 1, 1988, the barbers, through the United Food and Commercial Workers Union, AFL-CIO, Local 540 ("UFCW"), entered into a collective bargaining agreement ("CBA") with Weaver covering compensation terms and prohibiting the taking

---

[5]That is not to say, however, that the persistence of the parties in tangling with a difficult issue is not appreciated.

4

of tip credits against wages.  The CBA was a four-year agreement, set to expire in 1992.  Weaver's contract with the Army and Air Force Exchange Services ("AAFES") expired, however, in 1991. Shortly before expiration of the contract, the AAFES opened the bidding process and awarded the new contract, a five-year concessionaire contract, to Gino Morena Enterprises ("Morena") on January 31, 1991, with performance to commence on March 21, 1991. The contract, a multi-year service contract not subject to annual appropriations, was governed by the provisions of the McNamara-O'Hara Service Contract Act of 1965 ("SCA"), Pub.L. No. 89-286, 79 Stat. 1034 (codified as amended at 41 U.S.C. §§ 351-58 (1994)).

The parties dispute (1) the level of wages and fringe benefits that the SCA obligated Morena to pay the barbers[6] at various times under the contract;  and (2) whether Morena could take tip credits against wages.  Section 4(c) of the SCA provides:

> No contractor or subcontractor under a contract, which succeeds a contract subject to this chapter and under which substantially the same services are furnished, shall pay any service employee under such contract less than the wages and fringe benefits, including accrued wages and fringe benefits, and any prospective increases in wages and fringe benefits provided for in a collective-bargaining agreement as a result of arm's-length negotiations, to which such service employees would have been entitled if they were employed under the predecessor contract:  *Provided,* That in any of the foregoing circumstances such obligations shall not apply if the Secretary finds after a hearing in accordance with regulations adopted by the Secretary that such wages and fringe benefits are substantially at variance with those which prevail for services of a character similar in the locality.

41 U.S.C. § 353(c).  In accordance with this provision and 41

---

[6]It appears that the same barbers that had worked under Weaver continued to work at Fort Hood under Morena.

U.S.C. § 351(a),[7] the Wage and Hour Division of the Department of Labor issued, at the inception of the 1991 contract, a "wage determination," WD 74-0110 (rev.8) ["1991 wage determination"], stating that the wages and fringe benefits to be paid by Morena to the barbers at Fort Hood were those contained in the UFCW-Weaver CBA. Two years later, in accordance with the Secretary's regulations that are here the primary subject of dispute, the Wage and Hour Division issued WD 74-0110 (rev.11) ["1993 wage determination"] which, instead of incorporating the rates and benefits provided under the UFCW-Weaver CBA, reflected the Secretary's determination of the prevailing rates and benefits for the locality. Morena apparently paid the barbers in accordance with this wage determination through the remainder of the five-year contract.

## Administrative History

On November 19, 1993, plaintiffs requested administrative review of the 1993 wage determination, contending that (1) the rates and benefits set in the 1991 wage determination, reflecting the CBA rates and benefits, should apply to the full five years of the Morena contract pursuant to Section 4(c) of the SCA; and (2)

---

[7] 41 U.S.C. § 351(a) provides that every contract subject to the SCA shall contain provisions specifying the "minimum monetary wages" and the fringe benefits to be paid to employees performing services under the contract as determined by the Secretary in accordance with the wages and benefits "prevailing" in the locality "or, where a collective-bargaining agreement covers any such service employees," in accordance with the wages and fringe benefits provided for in such agreement. These determinations made by the Secretary are known as "wage determinations." In no instance may a wage determination set wages lower than the minimum wage set in the Fair Labor Standards Act. *Id.*

Morena's practice of crediting tips against wages violated the SCA and its accompanying regulations.  After relentless effort by the plaintiffs, including resort to the Administrative Review Board and institution of this lawsuit, the Administrator of the Wage and Hour Division finally, and with inexcusable tardiness, rendered on July 24, 1996 a decision upholding both the 1993 wage determination and Morena's tip credit practice.  The Administrator also ruled untimely an argument made by the plaintiffs that the 1993 wage determination, even assuming it was properly made based on prevailing rates rather than the rates set in the UFCW-Weaver CBA, did not accurately reflect wage rates prevailing in the locality.[8] Plaintiffs appealed the Administrator's decision to the Administrative Review Board, which upheld the Administrator's ruling on November 12, 1996.

The Administrator and the Administrative Review Board based their decisions on the Secretary's regulation interpreting and implementing section 4(d) of the SCA. Under that section, government service contracts

> may, if authorized by the Secretary, be for any term of years not exceeding five, if each such contract provides for the periodic adjustment of wages and fringe benefits pursuant to future determinations, issued in the manner prescribed in section 351 of this title[9] no less often than once every two years during the term of the contract, covering the various classes of service employees.

---

[8]Plaintiffs articulated this contention for the first time in this federal court lawsuit filed May 17, 1996 and submitted the question in their amended petition for review to the Administrative Review Board prior to the ruling by the Administrator.

[9]*See supra* note 3 (describing § 351 and the issuance of wage determinations).

41 U.S.C. § 353(d). The regulation interpreting and implementing this provision provides for biennial wage determinations which are characterized as "amendments" to the contract. See 29 C.F.R. § 4.145(b) (1996). As such, a multi-year contract is "treated as [a] wholly new contract[ ] for the purposes of the application of the Act's provisions and regulations thereunder at the end of the second year and again at the end of the fourth year, etc." *Id.* The Administrator reasoned that because the 1993 wage determination issued at the end of the first two years of the Morena contract created a new contract for purposes of the SCA, Morena became his own successor contractor in the second two-year period of his five-year government service contract. *See* 29 C.F.R. § 4.163(e).[10] The Administrator further reasoned that because Morena had not entered into a collective bargaining agreement of his own with his employees during the first two year term (the "predecessor contract"), section 4(c) of the SCA did not apply to the second two-year term (the "successor contract") and the new wage determination reflecting locally prevailing wage rates was proper.

With regard to the tip credit contention, the Administrator concluded that Morena's practice of crediting tips against wages was authorized under 29 C.F.R. § 4.6(q). That regulation provides:

An employee engaged in an occupation in which she or he

---

[10]This regulation emphasizes that "[t]he operative words of section 4(c) refer to "contract' not "contractor' " and concludes that "the statute is applicable by its terms to a successor contract without regard to whether the successor contractor was also the predecessor contractor." 29 C.F.R. § 163(e) (1996) (emphasis omitted). Therefore, "[a] contractor may become its own successor...." *Id.*

> customarily and regularly receives more than $30 a month in tips may have the amount of tips credited by the employer against the minimum wage....

The regulation imposes certain conditions an employer must meet before taking the credit, including a proviso that "[t]he use of such tip credit must have been permitted under any predecessor collective bargaining agreement applicable by virtue of section 4(c) of the Act." *Id.* § 4.6(q)(4). The Administrator concluded that because section 4(c) did not apply to Morena's second two-year term of the five year contract, neither did this proviso apply.

The Administrative Review Board affirmed the conclusions of the Administrator in a Final Decision and Order which constitutes a final decision by the Secretary. *See* Secretary's Order 2-96, 61 Fed.Reg. 19978 (1996). Plaintiffs' instant lawsuit, held in abeyance until the Final Decision and Order issued, is now ripe for decision.

In their Motion for Summary Judgment, plaintiffs essentially contend that (1) the decision of the Secretary violates the statutory requirements of the SCA, (2) the Secretary's interpretation of its own regulations is erroneous, (3) even assuming that the UFCW-Weaver CBA rates do not apply to the 1993 wage determination, the Department failed to properly determine the prevailing rates in the locality, and (4) the Secretary's determination that Morena's practice of taking tip credits is statutorily permissible is erroneous.

### Standard of Review

In reviewing administrative action taken pursuant to a

regulation issued to interpret and implement a federal statute, the deference to be accorded the action is dictated by whether the regulation at issue is "legislative" or "interpretive" in nature. *See Dresser Indus., Inc. v. Comm'r,* 911 F.2d 1128, 1137 (5th Cir.1990). Where the regulation is legislative, that is, "issued under a specific grant of authority to prescribe a method of executing a statutory provision," *Snap-Drape, Inc. v. Comm'r,* 98 F.3d 194, 197 (5th Cir.1996) (internal quotations and citation omitted), the Court may set aside the agency action only if the regulation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the action otherwise failed to meet statutory, constitutional, or procedural requirements. *See* 5 U.S.C. § 706(2); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). Action taken pursuant to an interpretive regulation, that is, one promulgated pursuant to a general grant of authority to prescribe regulations, is accorded less weight but is considered valid if it is reasonable and "harmonizes with the plain language of the statute, its origin, and its purpose." *Snap-Drape, Inc.,* 98 F.3d at 197 (internal quotations and citation omitted).

The Secretary promulgated the regulations at issue in this case pursuant to specific statutory authority. *See* 41 U.S.C. § 353(a) (1987) (providing that the Secretary's authority to make rules, regulations, and decisions in enforcing the Service Contract Act are coextensive with the Secretary's authority to enforce the Walsh-Healey Public Contracts Act); 41 U.S.C. §§ 38, 39 (1987)

10

(prescribing the extent of the Secretary's authority to enforce the Walsh-Healey provisions). This Court may therefore set aside the decision of the Administrative Review Board only if the Board's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the action otherwise failed to meet statutory, constitutional, or procedural requirements.

Under this standard of review, where Congress has "directly spoken to the precise question at issue," the Court must give effect to the "unambiguously expressed intent" of Congress. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Where Congress has not directly addressed the issue, as in this case, the Court must sustain the Secretary's regulatory approach so long as it is "reasonable" and "based on a permissible construction of the statute." *Auer v. Robbins,* --- U.S. ----, ----, 117 S.Ct. 905, 909, 137 L.Ed.2d 79 (1997) (citing *Chevron* ). In other words, unless the Secretary's approach is "irrational and not reasonably related to the purposes of the legislation," the Court must uphold that approach. *Clark v. Unified Servs., Inc.,* 659 F.2d 49, 53 (5th Cir.1981) (reviewing administrative regulations promulgated pursuant to the SCA). If the Secretary considered all relevant factors and made no "clear error of judgment," the Court must uphold the Secretary's decision regardless of the Court's view of the wisdom of the decision. *Volpe,* 401 U.S. at 416, 91 S.Ct. at 823-24; *Miranda v. National Transp. Safety Bd.,* 866 F.2d 805, 807

11

(5th Cir.1989).

### Secretary's Interpretation of SCA Provisions

Were Morena's service contract considered a single five-year contract rather than three short period contracts, plaintiffs would be entitled to the wages and benefits set in the UFCW-Weaver CBA for the entire five-year term of the Morena contract. The plain language of the Act and the legislative development of that language certainly supports the plaintiffs' construction. The legislative history of the amendments to the Act suggest, however, that while Congress did not specifically contemplate the Secretary's chosen construction, that construction adequately accommodates the purposes behind passage of the amendments. For this reason, the construction given by the Secretary is entitled to deference.

*Statutory Language*

The Secretary's regulation codified at 29 C.F.R. § 145(b), which interprets and implements section 4(d) of the SCA, conflicts with the clear language of section 4(d). The regulation provides for biennial wage determinations during a multi-year contract and deems those periodic wage determinations "amendments" to the contract. *See* 29 C.F.R. § 145(b). The regulation states that the wage determinations therefore create "wholly new contracts" for purposes of the SCA and its other regulations. *Id.* The most natural reading of section 4(d) does not comport with this interpretation. The section allows for service contracts to be for terms up to five years so long as wages and fringe benefits are

12

adjusted pursuant to wage determinations "issued ... no less often than once every two years *during the term of the contract*." 41 U.S.C. § 353(d) (emphasis added). The statutory language clearly contemplates the multi-year contract as being a single contract for a term of years. Moreover, wage determinations issued during the term are characterized not as full-scale contract amendments, but simply as the vehicles by which periodic adjustments of wages and fringe benefits are to be made over the life of the contract. *See id.* Congress could, however, have simplified the language of the provision considerably by use of the term "amendment" had this been what it contemplated.

Because Congress has not directly addressed the precise question at issue, however, the inquiry does not end with analysis of statutory language. The Court must determine whether the Secretary's construction of the statute is rational, reasonable, and in accordance with legislative purpose, not simply whether the Court agrees with the construction. After reviewing and carefully considering the legislative purpose and history of the Act and the amendments, the Court is of the opinion that the Secretary's construction of Sections 4(c) and 4(d), while somewhat creative, is not irrational or unreasonable.

*Evolution of Section 4(c)*

A careful study of the evolution of the Act supports, to some extent, the plaintiffs' argument. When section 4(c) was first drafted and passed the House and Senate, it did not contain the proviso for substantial variance hearings. *See* S. 3827, 92d Cong.

13

§ 3 (introduced July 21, 1972); H.R. 15376, 92d Cong. § 3 (introduced June 7, 1972), *reprinted in* LEGISLATIVE HISTORY OF THE SERVICE CONTRACT ACT AMENDMENTS of 1972 [hereinafter LEGISLATIVE HISTORY], at 1-9 (1972). The proviso was added only after testimony before the House Committee on Education and Labor and the Senate Subcommittee on Labor of the Committee on Labor and Public Welfare raised concerns about the wisdom of binding government contracting agencies to union contract wage rates that may often be significantly higher than prevailing wages in the locality. *See* H.R. 15376, 92d Cong. § 3 (reported with amendments Sept. 15, 1972), *reprinted in* LEGISLATIVE HISTORY at 55-60. Richard Keegan, the Deputy Under Secretary for Procurement in the Department of the Air Force put the problem succinctly:

> The Department of Defense, which foots the bill, would be locked into a one-way ratchet situation of constantly rising service contract costs, with no resort to independent standards to correct any imbalance. There would be nothing to prevent service employee wages from escalating far beyond the wages of comparable employees in the locality.

*Service Contract Act Amendments, 1972: Hearings on S. 3827 and H.R. 15376 Before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare* [hereinafter *Hearings* ], 92d Cong. 97 (1972). Thus the only mechanism explicitly contemplated by Congress for readjusting exorbitant union wages binding on a successor contractor was the substantial variance hearing. This does not mean *a fortiori,* however, that the Secretary's adoption of a regulation going beyond what Congress envisioned was an abuse of authority. As noted earlier, Congress granted the Secretary a wide girth of discretion with which to implement the Act. If the

14

regulation reasonably comports with the purposes of the Act and the amendments, it must be deemed valid.

*Legislative Intent*

Congress enacted the McNamara-O'Hara Service Contract Act in 1965. *See* Pub.L. No. 89-286, 79 Stat. 1034 (codified as amended at 41 U.S.C. §§ 351-58 (1994)). The House and Senate Reports accompanying the measure indicate that the primary purpose of the Act was to protect wage standards of employees:

> Since labor costs are the predominant factor in most service contracts, the odds on making a successful low bid for a contract are heavily stacked in favor of the contractor paying the lowest wages. Contractors who wish to maintain an enlightened wage policy may find it almost impossible to compete for Government service contracts with those who pay wages to their employees at or below the subsistence level. When a Government contract is awarded to a service contractor with low wage standards, the Government is in effect subsidizing subminimum wages.

H.R.Rep. No. 89-948, at 2-3 (1965); S.Rep. No. 89-798, at 3-4 (1965), *reprinted in* 1965 U.S.C.C.A.N. 3737, 3739. By requiring service contractors to pay their employees the prevailing wage rate, Congress sought to neutralize the federal government's inordinate purchasing power and its depressive effect on the market's natural resolution of wage and benefit rates. *See, e.g., Hearings* at 96 (explaining that the Act "puts the Government in precisely the same position as other users of contract services" and "limit[s] the extent to which the Government can exert its bargaining power."). In short, Congress did not want the federal purchasing power to play a role in suppressing wage rates.

The statute failed to completely effectuate its intended purpose, however. *See id.* at 14 ("[W]e would expect our Government

15

to be a model employer, but in this case, it is just the opposite. Now, we have to pass a law to prevent that." (statement of Senator Harrison A. Williams, Jr., Chairman of the Subcommittee on Labor and the Committee on Labor and Public Welfare)). Wage determinations based on the prevailing wage rate prevented government contracting from suppressing service workers' wages to a "subsistence level." But the nature of government contracting, calling for frequent rebidding, combined with the SCA's sole emphasis and reliance on the prevailing wage rate scheme, effectively diminished the bargaining power of unionized workforces. A contractor without a CBA covering its employees, or with a CBA setting comparatively low wage and benefit rates, was able to easily outbid an incumbent contractor bound by a CBA with higher wages and rates that would survive the commencement date of the new contract.

One example of such a scenario caught the attention of Congress not long after the enactment of the SCA and galvanized support for an amendment to the Act. In June of 1970, the National Aeronautics and Space Administration (NASA) invited bids for performance of particular services for a one-year period with performance commencing on April 1, 1971. *See Boeing Co. v. International Ass'n of Machinists and Aerospace Workers,* 504 F.2d 307, 309 (5th Cir.1974), *cert. denied,* 421 U.S. 913, 95 S.Ct. 1570, 43 L.Ed.2d 779 (1975). Transworld Airlines, Inc. (TWA) performed these services pursuant to a contract from 1964 through April of 1971. *See id.* At the time of rebidding, a collective bargaining

16

agreement negotiated between TWA and the union representing TWA's nonsupervisory personnel, the International Association of Machinists and Aerospace Workers (IAMAW), was in force. *See id.* This CBA was to "remain in full force and effect to and including December 31, 1971." *Id.* Four of the seven contractors bidding on the new contract, including TWA, based their computations of labor costs on the wages and fringe benefits provided for in the existing TWA-IAMAW collective bargaining agreement. One other bidder, however, the Boeing Company (Boeing), based its computation of labor costs on the wages and fringe benefits provided for in its own existing CBA with the IAMAW, an agreement that covered several employees engaged in substantially similar services at NASA. *See id.* This agreement provided for substantially lower wages and fringe benefits than did the TWA-IAMAW agreement, and NASA awarded the contract to Boeing. *See id.*

Congress added sections 4(c) and 4(d) to the SCA by amendment in 1972, *see* Pub.L. No. 92-473, § 3, 86 Stat. 789 (1972), largely in response to these events. *See Boeing Co.,* 504 F.2d at 311-12 & n. 7; *see generally Hearings.* Section 4(d) contributed to wage stability by allowing for longer term contracts. *See Hearings* at 103 ("That is one of the purposes of this legislation, to get away from those annual reopeners." (statement of Chairman Williams)). The Senate Report on the 1972 amendments indicates that section 4(c) was enacted to "assur[e] that employees working for service contractors under a collective bargaining agreement will have wages and fringe benefits under a new service contract no lower than

those under their current agreement."  S.Rep. No. 92-1131 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3534.  "The only relevant statements at the time § 353(c) was passed indicate that the purpose of that section was to remedy the practice of underbidding for government contracts by slashing wages."  *Gracey v. International Bhd. of Elec. Workers,* 868 F.2d 671 (4th Cir.1989);  *see also, e.g., Hearings* at 30 ("[T]he addition of subsection (c) to section 4, which recognizes the role of freely negotiated bargaining agreements in establishing competitive and prevailing wages, should counteract the cut throat bidding practices existing in certain service industries.").

*Conclusion*

This objective, the minimization of cutthroat bidding practices in order to stabilize wages, can be effectuated even with the regulation promulgated by the Secretary.  At bidding time for a multi-year contract, all prospective contractors must calculate their bids accounting for at least two years of wages and benefits at the rates established in the CBA governing the predecessor contract.  Thus, the bidding process does not work to undercut the wages and benefits bargained for by employees.  Truly the regulation may, in some circumstances, disadvantage the incumbent contractor.  If the incumbent contractor's CBA extends to a date beyond two years from the inception of the new contract period, that contractor will be obligated to pay the CBA wages and benefits longer than a prospective contractor without a CBA or with a CBA establishing lower wages and benefits.  This calculation may allow

18

the prospective contractor to underbid the incumbent contractor. As a result, contractors may have less incentive to enter into long-term CBAs that would extend past the two-year mark of the following contract term.[11]

But it is clear that Congress did not intend to entirely eradicate competitiveness in bidding—even where labor rates are at stake. For example, the Fifth Circuit has held that a successor contractor is not bound to the successorship and seniority rights acquired under the predecessor contractor's CBA. *See Clark v. Unified Servs., Inc.,* 659 F.2d 49 (5th Cir.1981). The Court acknowledged as "persuasive" the appellants' argument that leaving successorship rights and seniority rights out of the definition of "fringe benefits" in the Act emasculated the purposes of the SCA since prospective contractors could underbid incumbents by simply hiring employees with limited experience and fewer seniority rights and thereby underbid an incumbent. *Id.* at 52. The Court felt constrained, however, by the language of the Act, the determination of the Secretary of Labor, and the silence of Congress to read the statute otherwise, policy implications aside. *Id.; see also Trinity Servs., Inc. v. Marshall,* 593 F.2d 1250 (D.C.Cir.1978) (holding that severance payments and seniority rights are not "fringe benefits" under the Act); *Service Employees' Int'l Union v. General Servs. Admin.,* 443 F.Supp. 575 (E.D.Pa.1977) (holding that a successor contractor is neither obligated to hire the

---

[11]This problem is minimized, of course, by the fact that most collective bargaining agreements are no longer than three years. *See Hearings* at 103.

19

predecessor contractor's employees nor to abide by an arbitration clause in the predecessor's CBA).

Although it may provide little comfort to the plaintiffs at bar, the Secretary's regulation will sometimes serve to better uphold the purposes of the Act than the plaintiffs' construction of the statute. At least one circuit court has held that section 353(c) was enacted not to protect workers under an unfavorable CBA by enforcement of prevailing wage rates but simply to assure the maintenance of negotiated wage rates and benefits-even if they are lower than the prevailing rates. *See Gracey,* 868 F.2d at 674-77. Furthermore, the court held that the provision for a substantial variance hearing applied only where the employer sought to lower CBA-defined wages to a substantially lower prevailing wage rate and not to those situations in which the employees sought to increase the negotiated wage rates to the prevailing wage rate. *See id.* Where such circumstances exist, the Secretary's regulation creating "new" service contracts every two years works to the advantage of workers.

In short, the Secretary's regulation calling for a wage determination that creates a "new contract" at the end of every two-year period during a multi-year service contract, while not a natural construction of the statute textually, is acceptable because it does not undercut the essential purpose of the legislation. It is particularly reasonable as applied to the case at bar, where the UFCW-Weaver CBA would have expired one year into the new contract (and one year prior to the 1993 wage

20

determination) anyway.  The Court must therefore give deference to the regulation at issue.

Secretary's Interpretation of His Own Regulations

Plaintiffs alternatively contend that, assuming 29 C.F.R. § 4.145(b) was issued within the Secretary's authority, the Secretary failed to interpret the regulation properly in this case. Plaintiffs' burden on this claim is high;  the Secretary's interpretation of his own regulation is controlling unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins,* --- U.S. ----, ----, 117 S.Ct. 905, 911, 137 L.Ed.2d 79 (1997) (citations omitted).

To support their argument that negotiated rates and benefits apply to the entire term of a service contract, rather than only for the first two years, Plaintiffs make two arguments.  First, in their brief, Plaintiffs point to various other regulations promulgated by the Secretary to implement section 4(c).  Plaintiffs contend the regulations demonstrate the intention of the Department to make CBA rates applicable to the entire term of any contract. Plaintiffs urge that because the regulations specifically discuss section 4(c), and 29 C.F.R. § 145(b) does not, they are controlling and negate the Secretary's interpretation of § 4.145(b).

For example, the plaintiffs note that 29 C.F.R. § 4.163(h) gives examples, the "basic principle" of which "is that successorship provisions of section 4(c) apply to the full *term successor contract* " (emphasis added).  This section, however, is entitled "[i]nterruption of contract services" and simply provides

21

that an interruption in the provision of services—whether it be a temporary cessation of contract services between the old contract and new contract, a change in contracting agency, or the like—shall not negate the application of section 4(c). *See id.* The substance of this regulation does not conflict with the Secretary's interpretation of § 4.145(b), despite the "full term contract" language employed.

Another regulation provides that if certain contract requirements are, for whatever reason, broken out and placed into new contracts, the wages and fringe benefits provided for in the original contract under section 4(c) follow the new contracts. *See* 29 C.F.R. § 4.163(g). It is not inconsistent, however, to make all aspects of an original contract subject to section 4(c)'s successorship provision, yet to deem wage determinations made every two years in the resulting contracts as amendments creating new contracts. Plaintiffs have not demonstrated that 29 C.F.R. § 4.145(b) or the Secretary's interpretation thereof is inconsistent with its regulatory scheme.

Neither have plaintiffs shown that the Secretary has given 29 C.F.R. § 4.163(e) a "plainly erroneous" interpretation. As the Secretary notes in his response, the plaintiffs eliminated a critical portion of § 4.163(e) in their citation. This section specifically references § 4.145(b) in explaining how a contractor may become its own successor. In sum, the Secretary's interpretation of his regulations is neither plainly erroneous nor internally inconsistent.

22

In their second argument, made after hearing before the Court, Plaintiffs urge that even given the Secretary's interpretation of section 4(d), section 4(c) can plausibly be read to entitle the barbers to the UFCW-Weaver CBA wage rates and benefits for the successor Morena contract as well as for the predecessor Morena contract. Pursuant to section 4(c), an employer under a successor contract cannot pay its employees less than the "wages and fringe benefits ... provided for in a collective bargaining agreement ... to which such service employees *would have been entitled* if they were employed under the predecessor contract." 41 U.S.C. § 353(c). And under the predecessor Morena contract, the barbers were "entitled" to the wages and benefits provided under the UFCW-Weaver CBA.

Ironically, the Secretary's own regulations seem to support this reading of Section 4(c). In 29 C.F.R. § 4.163(e), the Secretary emphasizes that "*[t]he operative words of section 4(c) refer to "contract' not "contractor ' "* in explaining that a contractor may become its own successor contractor under the language of this section. The Secretary ignores its previous emphasis on the statutory term "contract" when explaining that "[s]ection 4(c) will be operative only if the employees who worked on the predecessor contract were actually paid in accordance with the wage and fringe benefit provisions of a predecessor contractor's collective bargaining agreement." *Id.* at § 4.163(f); *see also id.* at §§ 4.52, 4.105 (both speaking in terms of the "predecessor's" collective bargaining agreement).

23

The Secretary's decision not to interpret section 4(c) in this manner, however, is not unreasonable. The employees under a service contract may be said to be "entitled" to wages and benefits provided in the statutorily-mandated wage determination, bringing us back to the initial inquiry already discussed. Furthermore, the hearings and reports accompanying the amendments make clear that Congress enacted section 4(c) to address the cutthroat bidding practices employed by new contractors to compete with incumbent contractors.

The Secretary's Determination of the Prevailing Wage in the Locality

Plaintiffs contend that, assuming the second two-year period of Morena's contract is properly considered a new contract, the Secretary made its wage determination improperly. Where a CBA does not apply, the minimum monetary wages to be paid on any service contract are to be determined by the Secretary, or his authorized representative, "in accordance with prevailing rates for such employees in the locality." *See* 41 U.S.C. § 351(a)(1). Plaintiffs complain that the Department, before issuing the 1993 wage determination, reviewed no evidence on prevailing wage rates and improperly relied, in the Department's words, on wages "being paid by Gino Morena due to lack of survey data for barber occupation in the locality." Plaintiffs note the conundrum of this rationale: If the Department relied in 1993 on rates already being paid by Morena, and Morena was at that time subject to the 1991 wage determination incorporating the wages of the UFCW-Weaver CBA, why does the 1993 wage determination reflect wages at a lower rate?

24

The plaintiffs urge that the 1993 wage determination and all succeeding determinations based on it be held null and void and the Department of Labor ordered to issue new wage determinations.

The plaintiffs raised this argument for the first time in this lawsuit. They also presented the argument in their Brief in Response to the Statement of the Administrator in Opposition to Petition for Review to the Administrative Review Board (Transcript, p. 233 *et seq.*). The Administrator rejected the challenge as untimely, coming more than three years after issuance of the challenged wage determination, two years after expiration of that determination, and after expiration of the five-year contract. The Administrative Review Board upheld the Administrator's decision, citing 29 C.F.R. § 8.6(d) for the proposition that a decision by the Board "shall not affect the contract after award, exercise of option, or extension." Plaintiffs contend that they could not have presented the issue earlier as the written wage determination was missing the page specifying benefits.

The plaintiffs have standing to challenge the wage determination in federal district court under the Administrative Procedures Act. *See* 5 U.S.C. §§ 701-06; *United States v. Todd,* 38 F.3d 277, 278 (6th Cir.1994); *Expedient Servs., Inc. v. Beggs,* No. 81-31-Orl-Civ-Y, 1982 WL 2003, at *8 (M.D.Fla. Oct.4, 1982). The Secretary's regulations provide that "[a]ny interested person may seek reconsideration of a wage determination...." 29 C.F.R. § 1.8. The request "shall be in writing accompanied by a full statement of the interested person's views and any supporting wage data or other

25

pertinent information."  *Id.* The regulation provides no time limit for requesting reconsideration.  If reconsideration is sought and denied, an interested person may appeal to the Administrative Review Board for a review of the wage determination.  *Id.* § 1.9. Such an appeal "may, in the discretion of the Administrative Review Board, be received, accepted, and decided in accordance with the provisions of 29 C.F.R. part 7 and such other procedures as the Board may establish."  *Id.*  "Requests for review of wage determinations must be filed within 20 days of issuance of the Wage-Hour Administrator's decision denying a request to make a change in the wage determination."  29 C.F.R. § 8.3. "The Board may decline review of any case whenever in its judgment review would be inappropriate because of lack of timeliness, the nature of the relief sought, the case involves only settled issues of law, the appeal is frivolous on its face, or other reasons." *Id.* § 8.6.

The Court is of the opinion that the decision of the Department to reject this aspect of the plaintiffs' claim as untimely is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See* 5 U.S.C. § 706(2); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971).  Plaintiffs' November 1993 letter requesting review of the 1993 wage determination focused solely on the alleged misconstruction of § 353(c) and the plaintiffs' tip credit contention. Plaintiffs were obviously dissatisfied with the wage determination, and they could quite easily and prudently have requested review of the actual

"prevailing wage" determination in the alternative.[12]    Further, although the Department of Labor did drag this case out over several years, the plaintiffs apparently never raised the issue directly to the Administrator.  Rather, they included it within a petition for review filed to the Administrative Review Board. Under these circumstances, the Department's decision to deem plaintiffs' argument as waived is not arbitrary or capricious.

### Tip Credits

Finally, the plaintiffs contest the Secretary's determination that Morena's practice of taking tip credits is statutorily permissible.  The Secretary's regulations provide that an employer may credit against the minimum wages owed under the Fair Labor Standards Act (FLSA) so long as certain requirements are met.  *See* 29 C.F.R. § 4.6(q).[13]  The Plaintiffs do not argue the requirements were not met.  Rather, they argue the regulation is an erroneous interpretation and implementation of the Act. Plaintiffs can succeed in challenging this regulation only if they find it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the action otherwise failed to meet statutory, constitutional, or procedural requirements.  *See* 5

---

[12]Plaintiffs offer no reason why the fact that the second page of the 1993 wage determination was blank is relevant to their failure to make the argument.

[13]The section reads in relevant part:  "An employee engaged in an occupation in which he or she customarily and regularly receives more than $30 a month in tips may have the amount of tips credited by the employer against the minimum wage required by [the SCA] in accordance with section 3(m) of the Fair Labor Standards Act...."

U.S.C. § 706(2); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971).

A simple review of the statute fairly supports the reading the Secretary gives it. The section providing for wage determinations states that "[i]n no case shall ... wages be lower than the minimum specified in subsection (b) of this section." 29 U.S.C. § 351(a)(1). Subsection (b) states that no contractor or subcontractor subject to the SCA "shall pay any of his employees engaged in performing work on such contracts less than the minimum wage specified under section 206(a)(1) of Title 29." 29 U.S.C. § 351(b)(1). That section, contained in the FLSA, spells out the minimum wage. *See* 29 U.S.C. § 206(a)(1). The FLSA's definition of "wage" explains, in part:

> In determining the wage of a tipped employee, the amount paid such employee by his employer shall be deemed to be increased on account of tips by an amount determined by the employer, but not by an amount in excess of 50 per centum of the applicable minimum wage rate, except that the amount of the increase on account of tips determined by the employer may not exceed the value of tips actually received by the employee.

29 U.S.C. § 203(m).

Plaintiffs contend that the SCA, at § 351(b)(1), referenced provisions of the FLSA "for a limited purpose" only and that Congress intentionally failed to state that an employer can take a tip credit against wages to satisfy the minimum monetary wage requirements of the SCA. The Court does not agree that Congress intended to incorporate a provision of the FLSA without the FLSA's definition of a term contained in that provision. At the very least, the Secretary's understanding that Congress intended to

28

incorporate the definition is neither arbitrary nor contrary to law.

## Conclusion

This Court has no authority to overturn regulations promulgated by federal agencies charged with enforcing federal statutes unless they are unreasonable. Although the statutory language makes the question close, the Court cannot affirmatively hold the Secretary's regulations unreasonable given the particular facts of this case and the legislative purpose of the SCA. Furthermore, the Department's determinations with regard to plaintiffs' arguments about the prevailing wage determinations and the taking of tip credits are entitled to deference. Therefore:

IT IS ORDERED that Plaintiffs' Motion for Summary Judgment [# 16] is DENIED;

IT IS FURTHER ORDERED that Defendant's Cross Motion for Summary Judgment [# 23] is GRANTED.